THE STATE v. JACKSON, *Appellant.*

1. **Criminal Law** : CONFESSIONS. A person's admission or declaration of his agency, or participation in a crime, is limited in its precise scope and meaning to the criminal act itself, for which the confessor is then on his trial.

2. —— : ——. It is not the admission of a fact or circumstance from which guilt of that crime may be inferred.

3. —— : EVIDENCE : ESCAPE. Evidence that one in jail under charge of an offence requested a fellow-prisoner to aid him in making an escape, is competent against him on the trial.

4. —— : —— : ATTEMPT TO BREAK JAIL IN ANOTHER STATE. So it is competent to show that the defendant admitted that, on learning that he was to be extradited from a sister state for an offence charged to have been committed here, he endeavored to break jail in the former state.

5. —— : ——. The fact, however, that he did not aid in his own extradition can raise no presumption against him.

6. —— : MURDER : PROOF OF MOTIVE. It is competent for the state, on a trial for murder, as tending to show a motive for the crime, to prove that the defendant knew the deceased had a large sum of money on his person.

7. **Criminal Practice** : REMARKS OF PROSECUTING ATTORNEY. It is improper for a prosecuting attorney, in his argument to the jury, to say that the "escape of criminals, at the hands of jurors, brings on lynch law."

8. ———— : SECURING TOOLS TO ESCAPE : EVIDENCE.  The jury, in pass-
ing on the guilt of one charged with an offence, can take into con-
sideration any attempt on his part to secure tools to effect his
escape from jail.

9. **Instruction**: ALIBI.   There should be no instruction on an
*alibi* as a defence, where there is no evidence to warrant it.

10. **The Evidence in this Case,** which was wholly circumstantial,
reviewed, and the court refuses to disturb the verdict (which
found the defendant guilty of murder in the first degree) on the
ground that the evidence was insufficient to support it.

*Appeal from Franklin Circuit Court.*—HON. RUDOPLH
HIRZEL,  Judge.

REVERSED AND REMANDED.

*J. C. Kiskaddon* and *James Booth* for appellant.

(1)   That part of Hartley's testimony in which he
says defendant admitted that he committed another
crime in Ohio is inadmissible.   To be admissible it must
be a confession or part of the *res gestae.*   It is not a
confession.   A confession must acknowledge doing some
act which is a material fact in the criminal transaction
on trial.   *Gabriel v. State,* 40 Ala. 357 ; *People v. Wil-
liams,* 2 Abb. App. Dec. (N. Y.) 596.   As for instance,
in *Head v. State,* 44 Miss. 731, the declaration of defend-
ant as to the effect of a shot which took the life of a
person for whose murder defendant was on trial was
held to be admissible.   To admit evidence of other
crimes they must be brought into a common system or
direct connection with the crime for which the defend-
ant is being tried.   *Griffith v. Payne,* 11 A. & E. 131 ;
*State v. Laparge,* 57 N. H. 245 ; *Cole v. Commonwealth,*
5 Grat. (Va.) 696 ; *Farrar v. State,* 2 Ohio St. 54 ; *Brock
v. State,* 26 Ala. 104 ; *State v. Miller,* 47 Wis. 530 ; *Cole-
man v. People,* 55 N. Y. 81 ; *People v. Corbin,* 56 N. Y.
363 ; *Roesenweig v. People,* 63 Barb. (N. Y.) 634 ; *Sny-
der v. Commonwealth,* 65 Pa. St. 519 ; *Walker v. Com-
monwealth,* 1 Leigh (Va.) 574 ; *State v. Shuford,* 69 N.

C. 486; *State v. Rider*, 90 Mo. 54. It is inadmissible as part of the *res gestae*. *State v. Ware*, 62 Mo. 597; *State v. Evans*, 65 Mo. 574; *State v. Swain*, 78 Mo. 380; *State v. Gabriel*, 88 Mo. 631; *Sutton v. Johnson*, 62 Ill. 209; *Enos v. Tuttle*, 3 Conn. 250; *Elkins v. Hamilton*, 20 Vt. 627. The state of defendant's mind at the time he is said to have stolen horses is not material; state of mind at the time he is alleged to have committed the homicide is material. 1 Greenl. on Evid. (13 Ed.) sec. 108; *Carleton v. Patterson*, 29 N. H. 500; *Phillips v. Kelly*, 29 Ala. 628. It does not appear that defendant admitted stealing horses in a conversation, any part of which was admissible. Hartley and defendant were in jail together and were talking about their respective cases from day to day. They had numerous conversations. This appears by Hartley's testimony. But even if told in a conversation, part of which was admissible, the state could not introduce it. It is the defendant who may claim the privilege of getting the whole conversation and that on cross-examination. *Kinchelow v. State*, 5 Humph. (Tenn.) 9. (2) There was no confession and nowhere any evidence of a confession. The testimony of Hartley does not purport to be of any admission or acknowledgment by defendant of his agency or participation in the crime charged against him. The fourteenth instruction given by the court is, therefore, wrong. It was error to dignify anything the defendant said with the name of a confession. *State v. Jones*, 33 Iowa, 9; *State v. Red*, 53 Iowa, 69. (3) The testimony of Jos. Noelke is absolutely immaterial, while it might tend to prejudice the jury with the implied idea that he denied his identity. Even if he required the officer to prove it, it could not be construed as an admission or confession of guilt. Whar. Crim. Evid., sec. 680. (4) The court should have given an instruction on the defence of *alibi* predicated on defendant's own testimony. The defendant testified that he

was not present at the time and place where McVickers was killed. This is an *alibi*. Instructions must be predicated on defendant's testimony. *State v. Banks*, 73 Mo. 592; *State v. Anderson*, 86 Mo. 309; *State v. Partlow*, 90 Mo. 608. And where there is evidence of an *alibi* the court should instruct on that point. *State v. Kelly*, 16 Mo. App. 213; *State v. Johnson*, 91 Mo. 439. (5) The thirteenth instruction given by the court is erroneous as it stands. The court might as well have told the jury that the testimony of any other witness, taken together with defendant's conversations, was more credible when it was against him than for him. *State v. Maguire*, 68 Mo. 197; *State v. Cook*, 85 Mo. 40; *Bowers v. People*, 74 Ill. 418; *Bulwer v. People*, 95 Ill. 394. (6) While it is conceded that no one particular act of the jury may be sufficient to warrant the setting aside the verdict, yet it is submitted that the affidavits disclose such a general looseness of conduct, and such carelessness on the part of the officer in charge of them as to defeat the purpose of the statute requiring their seclusion. (7) The evidence does not support the verdict.

*B. G. Boone*, Attorney General, for the state.

(1) The admissions to Hartley by the defendant were admissible in evidence. They were made in attempting to explain away suspicions as to his connection with the crime. All and not a portion of such statements are properly admitted, whether favorable or against the party making them. 1 Greenlf. Evid., sec. 218; 2 Russ on Crimes, 868; *State v. Carlisle*, 57 Mo. 102; *State v. Branstetter*, 65 Mo. 149. Evidence of the commission of other crimes by defendant was in this case only brought out incidentally, and its effect was to benefit rather than injure defendant, because it showed that he was disturbed when he heard of McVickers' murder, not on account of fear of punishment, according

The State v. Jackson.

to his statement, but because of the accusation of its commission being made against him. Admission of evidence favorable to the accused is not error. *State v. Holmes*, 54 Mo. 153. (2) Where proof of an *alibi* is not made as a substantive affirmative defence it should be treated as other evidence in rebuttal, and a separate instruction in regard to it is not required. 1 Bish. Crim. Proc., secs. 1062, 1066; *State v. Murray*, 91 Mo. 95; *State v. Jennings*, 81 Mo. 185; *State v. Rockett*, 87 Mo. 668; *State v. Kelley*, 16 Mo. App. 213. The defence of *alibi* was not made or attempted to be made in this case. (3) The thirteenth instruction complained of by appellant was proper.

SHERWOOD, J.—Labadie is a town in Franklin county on the Missouri Pacific Railroad, near the Missouri river. At that point, the railroad, in pursuing its general eastwardly course towards St. Louis, turns a little east of south in going to Gray's Summit, the next town on the railroad. Pacific is the next town on that road, situate at the junction of the Missouri Pacific and the 'Frisco Railroads, and nearly due east from Gray's Summit, so that Pacific, in consequence of the elbow thus formed, is nearly due southeast from Labadie; and much nearer in an air line to that place than by the railroad route. These facts are gathered from a *map* of the state, and not from the record; and this is done in order to a better understanding of the facts which this record *does* disclose.

At about nine o'clock on the morning of October 22, 1886, the train arriving from St. Louis brought to Labadie the defendant, Webster Jackson, then some twenty-two years of age, and another man of sixty years, named Alexander McVickers. They had previously worked together for some time as cooks, etc., at Keene's camp in the neighborhood, but had quit there a month before, and the defendant had gone to St. Louis,

and upon his return after a short absence, had returned to Labadie and worked a few days at Schaefer's camp, and after that had gone again to St. Louis. Both men, it seems, were well known in the vicinity. Upon alighting from the train, Keene, their former employer, spoke to both of them, and said: "Hello! Jackson, what brings you back in this country?" To which Jackson replied: "I am just going back into camp." F. M. North, who knew McVickers by sight, but was well acquainted with Jackson, met them, after they had alighted from the train, and spoke to Jackson, who "said that he and the old man (meaning McVickers) had got a job at Schaefer's, and were going down to cook there." Jackson seemed to be in a hurry, and said the old man was ahead of him. They were then going towards Schaefer's camp, which is about five miles east of Labadie, and the path they were taking leads directly to the road that goes to Reed's Landing, and that road crosses Fiddle creek on a bridge, and goes from there to Pacific. Reed's Landing is about three and one-half miles from Labadie, and the bridge is about equidistant between Labadie and Reed's Landing, and the road going from the bridge leads to Schaefer's camp turning off at Utter's place, which is a mile and a quarter to a mile and a half from Schaefer's camp.

T. M. Luce, a practicing physician, also saw Jackson and McVickers at Labadie at the time already mentioned, and while the doctor was speaking to Jackson, McVickers walked on. Dr. Luce says he inquired of Jackson where he was going, and Jackson replied that he was going to Schaefer's camp to cook, when Dr. Luce told him that he had seen Mr. Stevens at Schaefer's camp, who had said to him that Jackson's services were not required. That Jackson then said: "That is all right; I have been to the company's office in town, and have seen Mr. Schaefer, and he told me to go up to

Pacific and get the old man and come out; no trouble about my and the old man's wages." Jackson's last words to the doctor were: "Well, there goes the old man; I must catch up;" and they went off in the direction of Schaefer's camp. Dr. Luce also testified that Jackson was not well at the time he saw him at the train; that he had been treating him for malarial trouble, and that his face on that morning displayed unusual pallor.

Jackson and McVickers were next seen together by Jas. C. North, who saw Jackson and an old man with him about half-past nine o'clock, as near as the witness could judge, having heard the nine o'clock train pass up. The point where North saw and spoke to Jackson was about fifty yards from Alkire's west line, about a mile and a quarter, or a mile and a half east from Labadie, and the bridge is at Alkire's east line, about half a mile from where North saw them. They were on the Labadie side of the bridge, and were traveling east in the direction of it, and about a half a mile therefrom. The road they were on leads from Labadie to Reed's Landing, and is the road used to go to Schaefer's camp.

Alkire, who was working in his field that morning some thirty yards from the county road, at about ten o'clock, as well as he could guess, saw two men passing by, apparently closely engaged in conversation. He had never seen them before, but he says one of them resembled Jackson, and the other McVickers. They were walking very slowly, and the older one appeared to be sick or lame, and carried a satchel or valise. They were going east in the direction of the bridge; and were about a quarter of a mile from it. Shortly after passing Alkire's house, which is one and one-half miles east from Labadie, the road turns and goes down hill towards the bridge, which crosses Fiddle creek before mentioned, and is in the woods, though the road of the usual width is fenced on both sides. This bridge is some

thirty-four feet long, and the floor of it some ten feet above the water.

Jackson was next seen alone beyond the bridge and on its east side something over a mile and a half east from the bridge and about a half mile east of Meyer's vineyard, and on the same road; and Meyer's vineyard is something over a mile from the bridge. This was near Reed's Landing on the Missouri river, and the parties who next met him were Reed and his son, who were riding in a wagon. This was just about eleven o'clock, and this time is fixed by young Reed, as that was the time he usually went to his dinner; and his father was of the same opinion as to the time. It seems that young Reed knew Jackson, who was walking along at an ordinary gait with a little grip-sack in one hand, and a spring overcoat on his arm; and when they met Jackson spoke and smiled as he passed on. He was next seen at Henry Utter's, sometimes called Keene's camp, where Jackson and McVickers had formerly worked together; this is about two and one-half miles from the bridge. Here Jackson spoke to Henry Utter, said "Hello!" went to the wagon, shook hands with him, and then went over to Marquitz's store close by, spoke to Marquitz and his partner, with whom he was well acquainted, took a couple of drinks of water, tried to trade watches with Calvin, and remained there something like a half an hour, and when he left went in the direction of Staples' place. This was between eleven and twelve o'clock, but the exact time is not known.

The testimony of the witnesses who testified as to Jackson being at that point is, in substance, as follows:

David Marquitz testified: "In 1886 I lived at Fiddle creek, in this county, four miles from Labadie. I had a dry goods and furnishing store there. I have known both Jackson and McVickers since about March or April, 1886. He came to my tent often. My camp was located on the road that goes from Labadie to Mr.

Utter's. I saw Webster Jackson October 22, 1886, alone, between eleven and twelve o'clock, with a little black satchel in his hand and a brown spring overcoat on his arm. Before he came to me, he was at Mr. Utter's talking with that gentleman, and he said he was going away. When he came to me, I said, 'How do you do, Mr. Jackson?' and he says, 'How do you do?' Well, certainly he did not tell me in the same tone he did some other times. I told him, 'It is good you have come, Mr. Jackson; at Keene Brothers' you will have good employment.' He did not answer me at all. The next time I spoke to him I said, 'Why don't you go down to see about that employment?' And he gave a very strong-voiced answer, 'Give me time and I will go.' I never knew him to speak to me in that way before, and I did not talk to him any more, for I saw that he was kind of desperate. He afterwards went out and took a looking-glass and looked in it. After that he asked about the road to Pacific and how far it was. He also asked where Mr. Staples lived. He said he was going to Pacific. He was very nervous and always looking towards the Labadie road. I believe he asked me if I could take him to Pacific, if I had a horse and light wagon. I told him my horse could not carry him, and road was not good to Pacific." Cross-examined: "I came to Mr. Utter's camp about March or April. I had my goods in a wagon for a few days. I don't know whether Jackson was careful about his dress or not, but I know he dressed neatly. I saw him looking in the glass, but I did not notice him brush his clothes. I did not pay much attention to him. I would not have thought his actions unusual if I had not heard of the murder."

H. Wexler testified: "In the summer of 1886 I lived at Henry Utter's place. I was a merchant there. I knew Webster Jackson, but did not know Alex. McVickers. I saw Jackson in our tent, at our store, on October 22, 1886. He came to Henry Utter and said,

'Hello;' then went to the wagon and shook hands with him. Then he came up and I spoke to him. He had an overcoat and a satchel, which he put on a chair, and got a drink, and then came into our store. He looked very bad; he was pale. My partner and I looked at his coat, it being pretty nearly like our's. He then went out of the store and was looking in a glass behind the store; then he got another drink of water; then he came back and asked, 'Do you know where the express-man is?' We had a fellow who took passengers to the railroad, and we called him the expressman. I told him he had gone to Pacific with a lady passenger. He then went to the back-house and met Mr. Calvin, with whom he wanted to trade watches. He then came back, took his overcoat and satchel, and asked my partner if Mr. Staples lived very far from there. My partner told him the distance, when he said, 'good-bye,' and left. He said he wanted to go to Pacific." Cross-examined: "That was between eleven and twelve o'clock, but I can't say whether it was nearer eleven or twelve. My partner is Marquitz. I did not know that he had quit Mr. Keene's some time before on account of being sick. This expressman I spoke about sometimes carried passengers to Labadie and sometimes to Pacific. Jackson was about our store probably about half an hour. I did not notice any blood on his clothing. I deal in clothing, and I take notice of the kind of clothing people wear, and whether it is neat or otherwise. I did not notice anything peculiar about his clothing. I noticed it had a fine check like our suits. I noticed he was looking at his clothing all the time."

Isaac Calvin testified: "I am acquainted with Jackson, and saw him at Henry Utter's on October 22, 1886. I spoke but a few words with him. I did not notice him particularly. I believe I was talking to him about trading watches, but we did not trade. I was in

a hurry. This was about eleven o'clock." Cross-examined : "He pulled out his watch and spoke to me about trading watches. I was in a hurry and did not look at it particularly, as I wanted to go to Pacific before the train went down, and I had to walk. We just passed and he spoke to me about the watch. I took hold of the watch, but did not open it. He did not take hold of mine. He said he wanted eight dollars to boot. I did not notice the time either by his watch or by my own, nor was the time mentioned. Jackson was in a hurry to get to Pacific and wanted Mr. Utter to take him. I was in a hurry to get there too. I had to walk, and Mr. Staples took him in a wagon."

Jackson was next seen at Staples', which is about a half mile from the last place mentioned, and about two and three-fourths miles from the bridge. The testimony of Staples and his son is, in substance, the following:

Louis Staples testified : "I was acquainted with Jackson in the year 1886. I have seen McVickers, but was not very well acquainted with him. Jackson was at my house in the middle of the day on October 22, 1886. My house is about half a mile from Marquitz's store. Jackson came to my house just as we were sitting down to dinner, about twelve o'clock, but my clock had stopped. He told me he had come from Labadie and he wanted me to take him to Pacific. He said he had a notion to go out to the Indian Nation. I asked him if the old man was with him, and he said yes, that he had come up with him as far as the vineyard on Mr. Meyer's place, and had then gone back again, he thought, to the Keene Brothers' camp. I did not notice his actions particularly that day. He asked me for a drink of water and I asked him to come right in the house, and he could not drink the water, but threw it right out, saying, 'I am very dry, but I cannot swallow this water.' He said he had been sick, and I said, 'Yes, you look

pale; I guess you have been sick.' He asked me how far it was to St. Louis by the line of railroad, and I told him about forty miles. He asked me if there was any nearer station than Pacific for going out west, and I told him there were two nearer, Labadie and Gray's Summit, but if he wanted to go west I would not take him to any other station. I told him if he wanted to go to Pacific we had plenty of time, but he was a little anxious to get away. He asked me if I could take him to the station below Pacific, and I told him, no, I would not take him to any other station, but if he wanted to go to Labadie or Gray's Summit, I had no objection. Pacific was the place he asked for first. I know where the bridge is where Mac was found dead. I live pretty nearly three miles from that bridge. So far as I understood him, he told me the old man wanted to go with him to the Indian Nation, but that at the vineyard he had turned back. He spoke something about working at Schaefer's camp, and that he had got sick. Meyer's vineyard is probably half a mile from my place. Mr. Reed's place joins Meyer's place and is nearer to me than the vineyard. I had my boy take him over to Pacific. While I was hitching up my team he looked at his watch and said it is half-past one now. In the house he had said his watch had stopped. I think he had been at my house about an hour and a half. He was anxious to get away; that is all I could notice in him." Cross-examined: "Jackson looked pale and said he had been sick. I did not know that he had been sick at Keene's camp and had left there for that reason. It is between seven and eight miles from my place to Pacific, and we call it four miles to Labadie. I did not pay much attention to his clothing. He seemed to be neatly dressed. We call it one mile from my house to Reed's and maybe it is half a mile further to Meyer's vineyard. It is something over a mile and a quarter

from Meyer's vineyard to the bridge where Mac's body was found.

Joseph Staples testified: · "I am a son of Louis Staples. I know Jackson and knew McVickers. I saw Jackson at our house October 22, 1886, and took him to Pacific. He asked us if we could take him to Pacific and we said, yes, after the horses were fed. My father asked him where he was going and where the old man was, and he told him that he came with him from Labadie, that they were going to some camp I think, and that he came to the vineyard and went back. I think he said he wanted to go to the Indian Nation. I did not notice his manner there at the time. I had seen him always and did not pay any attention to it. I had brought milk to Keene's camp three or four times a week for two or three months while Jackson and McVickers were cooking there. I was not present at all the conversation between him and my father. While driving to Pacific I did not notice anything particular about him, only hurrying me to go faster, saying that he might be too late for the train, and he would look at his watch and look back every once in a while. We didn't talk much. He took out his pocket-knife and whittled on straws. I drove pretty fast. I don't know what time we got to Pacific, but I think about two o'clock or a little after. I don't know what time the train got there. We went to the depot and stayed there about ten minutes, and he asked me to play a game of pool with him, but I declined and left for home. He paid me a dollar and a quarter for taking him to Pacific. I did not particularly notice Jackson's conduct while he was at our house. He seemed to be in a hurry; afraid he would miss the train."

As to Jackson's conduct on reaching Pacific we have this :

Emily Reidenauer testified: "I am not acquainted with Jackson, but I saw him October 22, 1886, at

Pacific. I noticed he was restless, that he would get up in the waiting-room two or three times and go to the door and examine his cuff. He purchased the ticket at the Pacific railroad office, and then jumped on a train on the 'Frisco track. The 'Frisco started first, but only for an instant first." Cross-examined: "I was going to St. Louis at the time. I could have taken either the Pacific or 'Frisco train. The only peculiar actions I noticed about him was that he was restless. I have never traveled much. I know how it feels to wait for a train. It makes one restless, but it don't make all those actions. The Pacific train was behind time that afternoon. He called for a ticket to the city, not to go west."

John Dickerson testified: "I am now and was on October 22, 1886, agent for the 'Frisco road at Pacific. I don't know Jackson, but I think I saw him on that date at the Union depot in Pacific. He seemed to be in a rather nervous state of mind and anxious to take the train. I judge so from the fact that he asked me twice about the train. Our train got to Pacific at 4:36, if I mistake not. The first train on the Missouri Pacific gets there at 4:00 p. m. and the second at 4:48, I think. When I went out to put my express on the train he was standing with his grip in his hand and overcoat on his arm, just as if he were about to get on the train, but I did not see him get on. He did not buy a ticket from me. A Missouri Pacific ticket is not good on the 'Frisco trains. J. C. Hennessy was station agent of the Missouri Pacific at that time." Cross-examined: "I think it a little unusual to tell parties twice when trains leave. Persons waiting for trains are a little more nervous than at other times whether there is anything the matter or not."

On the day already mentioned, Wiley Russell, who was at work shucking corn at Powell's place, some two hundred and fifty yards from the bridge, heard three

shots, two quite close together, fired from a pistol or a gun. This was in the direction of the bridge over Fiddle creek, and as near as the witness could judge, between nine and ten o'clock in the morning. And he forms his opinion in part upon having heard the local train reach Labadie and that the shots were fired after that time. About twelve o'clock on that day, Henry Bradley, who had been to Labadie, and was returning, as he walked along the bridge just mentioned, saw a man's hat, going to get which he discovered the body of a man, afterwards proved to be that of Alexander McVickers. It was on the opposite side of the creek from Labadie, in a narrow gully, with steep sides, only some two and a half or three feet from the northeast corner of the bridge, sitting or lying at an angle of about forty-five degrees, and pretty well concealed by brush, etc., thrown over and around it. Some of the brush had been brought a distance of twenty or twenty-five feet. Leading down by the side of the corpse were the tracks of but a single person ; they led to the water under the bridge, and in a pool of water there was found a small satchel broken open, which contained a few articles of clothing. The tracks then returned, passed the corpse and went into the wagon track, and then disappeared. The ground being soft under the bridge, afforded good opportunity for measuring the full impression and length of the tracks ; this was done with a rule at the time of the discovery of the body, and they measured exactly nine inches.

An inquest was held upon the body, and it was fully identified as that of McVickers. The left temple was somewhat powder-burned, as if the pistol was not more than eighteen or twenty inches distant when the shot was fired. A bullet-hole was found in the parietal bone above the left eye, and the bullet had evidently penetrated the brain some four inches and then made its egress at the inner corner of the left eye. And it

was in evidence that the shot must have been fired while McVickers was below the person shooting, and that the ball ranged downwards and inward. The throat was cut, and the windpipe, jugular vein, and carotid artery severed, as with a knife. It was testified that either the gunshot wound or knife wound was sufficient to cause death. The body had bled very profusely, and the woolen clothing upon it was drenched with blood, and the bottom of the gully was bloody. There were no marks of a struggle upon the road or elsewhere, nor were there any bloodstains upon the ground, except as stated. The pockets were turned inside out and the seam of the pants cut. There was no money found on the body, and there were indications of a belt having been worn about the waist, causing discoloration. It was in evidence that there was a great deal of travel upon the road where the murder occurred, and that there was scarcely an hour in the day when persons might not have been seen traveling afoot along that road.

It was testified by one of the medical experts that if a man be first shot, shot through the brain, that the effect would be to retard the flow of blood caused by severing the jugular vein and the carotid artery. There is nothing on the subject that I can find in works on medical jurisprudence; but I am assured by an eminent physician of this place that if a man were first shot dead by a bullet through his brain, and then his throat cut immediately or in a few minutes afterwards, the blood would gush as freely as if the vein and artery had first been severed.

Jackson, the defendant, was indicted for the murder of McVickers and brought back from Ohio, upon requisition, and being put upon his trial, the testimony already set forth was elicited, as well as other testimony to be hereafter mentioned. Being unable to employ counsel, the court appointed Messrs. J. C. Kiskaddon and James Booth to defend him.

It was also in evidence that Jackson was aware of the fact that McVickers carried a considerable sum of money about his person, and that, some months before the death of McVickers, Jackson had told Dr. Luce that McVickers had about five or six hundred dollars, which he carried in a belt about his person. It seems, however, that it was commonly known about the camp that McVickers was the possessor of a considerable sum of money. It was disclosed by the testimony that, about one week prior to the murder of McVickers, Jackson, on his return from St. Louis, had showed F. M. North an overcoat, and said that is what he had used his money for, and was "*busted flat then.*" W. A. Keene testified that Jackson, about the same time, made a similar declaration to him. This kind of testimony was introduced in order to show a motive on Jackson's part to commit the crime with which he is charged.

The witness, Meyer, having testified that the ground under the bridge was "kind of miry," that the tracks were those of one man, and that they measured nine inches long from heel to toe, said, upon cross-examination : "I am positive that the measurement of the track was nine inches from end to end; I am sure of it; no mistake about it." The defendant was then requested to approach the witness and have his foot measured with the same rule with which the tracks had been measured, and the witness having measured it, said : "It measures eleven and one-half inches." Requested then to remove his shoe and sock for the measurement of his bare foot, the defendant did so, and the witness having measured it, said: "It measures nine and one-half inches, but the heel may have projected out." Defendant was then requested to place his bare foot upon a piece of paper which was then marked both at the heel and the toe with a pencil; the witness having taken the measure, said: "That is ten inches less a small fraction." Similar testimony was adduced

tending to show that Stewart, another witness, was in error as to the length of defendant's foot, which he said was much shorter than his own.

The testimony of Schaefer and of Stevens, his book-keeper, showed that the statement of the defendant that he had been employed by Schaefer, as stated by defendant to F. M. North and Dr. Luce, on the morning defendant and McVickers left the train at Labadie, was untrue.

Stephen Hartley was confined in jail for forty days, in the same jail with the defendant. His testimony as to conversations with the defendant was this: "We were in there day and night and were pretty nearly all the time talking. We were talking about his case and mine together. He told me about his case, and how it came up, and what caused it. He said he was going down here at the camp on the railroad at Keene Brothers, I think it was, and got sick, or something or another the matter, and he went down for Mac, this old man, and he returned to Labadie. On his return he met Frank North at the depot and he asked him (Jackson) where he was going, and he said: 'I am going to Keene Brothers' camp,' and he said, 'It is no use for you to go there, you won't get a job.' Then he started toward Pacific, he and Mac, and passed several different parties, and then went on down near Withington's farm, and there they sat down and had a conversation, and then Mac got up and started towards Keene's camp to get work, and he started for Pacific. He said he went to a man by the name of Staples, I think his name is, and called there for a team to take him to a station on the Pacific railroad; that he got there about dinner-time; that they wanted him to eat dinner, but he did not feel well. After they got through their dinner they got their team and the boy took him to Pacific, where he remained until that night; I think it was till evening, and then he got on the train and went to St. Louis, and there he

remained one day and two nights, as well as I can remember, but I'm not positive; then he went over to Ohio, either Cleveland or Dayton, I'm not positive, and remained there, three, four, or five days. While he was around in a store, I believe, he picked up a newspaper and examined it, and he saw that Mac was dead, and that he was accused of the murder, and it wrecked his mind so he did not know what to do, so he went to stealing horses to pacify his mind. That is the way he stated it to me. He and his partner stole two horses apiece, that is, four. They got him after that and had him in jail, and he stood his trial and was condemned to the pen after that for two years. After he had been condemned to the pen and found out that he was going to be brought back to this state is the time he tried to make his escape from the jail. There was a hatch-hole in the jail, he called it, and they tied some sticks together with pieces of blanket and fixed it so they could reach up to that hole, and he got up and put his hand on the hatchway and the man in the bull-ring shot at him, and he let go and went back. We had a talk about this jail. He told me he wanted me to get him some tools to get him out with. That was about a week before my time expired. He said I could get the tools after I got out and put them through the back part of the house in some way or another, he did not say how, and then he could make his way out. We had a conversation about Mac's money. He told me he had seen Mac's money when they were in camp together and had seen it lying around on the table and bed; that Mac was very careless with his money, and that he had taken it up several times and handed it to him. I think he said he had six or seven hundred dollars when he was in camp. Jackson told me that McVickers had six hundred dollars in his belt and a hundred and fifty dollars that he carried for change; that he had seen the money several times when they were cooking together."

VOL. 95—41

To this testimony the defendant objected upon these grounds: That said testimony was not a confession of anything tending to show his guilt of the crime charged in the indictment, but was only the confession of the commission of another crime; that testimony of a confession that defendant had made an attempt to escape was too remote, and that all such evidence merely tended to prejudice the case with the jury, without raising any sufficient presumption to be permitted to go to the jury; but the court overruled said objections, and the defendant excepted.

This was in substance all the evidence offered on the part of the state, except Noelke's testimony, which was as follows: "I know Webster Jackson. He came from Ohio; that was in November or December, I forget now, but I brought him from Hamilton, Butler county, Ohio. I got him on a requisition from the Governor of Missouri on a warrant. I arrested him there at Hamilton. I had to go there twice. I spent all together about a week there in getting him. The reason I couldn't get him the first time, the warrant was directed to the sheriff of Warren county, and they required me to bring proof along. I got another warrant and then identified Jackson as the party. He was not delivered to me then. I could not get him unless I had some proof of his identity. I telegraphed for Mr. Keene and Mr. North. I then got him and brought him here and delivered him to the sheriff of this county." Exceptions were taken to the admission of this testimony.

The defendant on his own behalf testified as follows: "I am twenty-four years old. My home is ten miles north of Dayton, Montgomery county, Ohio. I have a mother living. I came to Franklin county, Missouri, on the last Sunday in April, 1886. I came up the Missouri river to Fiddle creek, where I was engaged as a cook by Keene Brothers at thirty dollars per month. I did not have a dollar when I got there. I worked three days in

the kitchen, when I told Mr. Keene that I could not fill the bill, and asked him to give me another position, and he put me in the dining-room at fifteen dollars a month. I continued in that position during the month of May, and then I worked in the kitchen at thirty dollars a month, board and lodging included. I knew Alex. McVickers. He came to Fiddle creek after I got there and went to work in the kitchen as baker. He was a right nice old man. I believe his wages were forty-five dollars a month. I was in the employ of Keene Brothers until September 22, 1886. The last two months I got thirty-five dollars a month. Sickness, malarial fever, caused me to leave their employ. I got some quinine from Dr. Luce at Labadie. McVickers and I got along all right while we were with Keene Brothers. We worked together in the kitchen, he as baker and I as cook. Mac got sick the latter part of August. He went to bed, and I doctored him and did his work and my own both until September 22, and I worked myself sick to do it. I did it in order to hold his job until he got well. There was something the matter with his leg—an abscess or something on the side of it. I know that Mac had some money. He had one hundred and fifty dollars in camp with him. He used to leave it on the bed, and he left it in my care day after day. I know nothing about his having money in a belt. It was commonly known among the men in camp that Mac had money. There were about sixty men at the camp I was at, and there were three or four other camps up and down the road besides the one I was at. There were one hundred men at Schaefer's camp, just a mile or so below. These men were very flighty—work a day or so and then go off to another camp—liable to go at any time—no dependence to be put in them—work a day or so and pull up and go somewhere else—just about all the time on the go. I did not tell Dr. Luce that Mac had money in a belt. I may have told him he had

money to pay his bills. When I told him that, it was simply because I had got some medicine from the doctor for Mac, and it was very natural for me to tell him Mac had money to pay his bills. He had always paid his bills so far as I knew. I don't remember the date when I gave Mr. North that fifty dollars—probably the month before I left there. He had it in his possession probably a couple of weeks. George Bobb, a clerk for Keene Brothers, got short of money and wanted to cash some checks for the firm, and asked me for fifty dollars. I got the money from Mr. North. He wanted to cash some time-checks fifty per cent. off. I let that money stay there to be kept until I left, and then I got it and some more with it. When I left Keene Brothers and started for St. Louis, I am not positive how much money I had, but I had in the neighborhood of one hundred dollars. I worked from April to May at fifteen dollars a month ; and June and July at thirty dollars a month ; and August and twenty-two days in September at thirty-five dollars a month. I had the whole of that, with the exception of a couple of dollars I had spent. I went to work in April and worked until September 22, and I had no opportunity to spend money. I used to go to Labadie to get medicine, and I got some few little articles from Mr. North—probably a shirt or something of that kind. When Mac learned I was going to leave Keene Brothers, he got ready to go along. He went to Pacific, and I went to St. Louis. I bid him good-bye in Pacific, not knowing that I would ever see him any more. At St. Louis I got a room and some medicine and doctored myself up. I stayed in St. Louis a week or so and then came back to Labadie. When I got to Labadie, I went to board with Mr. Jahrauh, and stayed there three or four days. Dr. Luce told me that some cooks had quit at Schaefer's camp. He gave me a letter of recommendation there, and I went down to see about getting a job. I have not the letter of recommendation

now, I don't know where it is ; likely I threw it away or tore it up. At Schaefer's camp I saw Mr. Stevens ; he is clerk and bookkeeper for Schaefer & Nichols, and made arrangements about working for them. He asked me if I could get any one to go in with me, and I told him I thought I could get Mac. He told me to go to Pacific and get Mac, and he would put us both in the kitchen. I went to Pacific, met Mac, and stayed with him that night, and the next morning we took the train and came to Labadie, and went down the public road to Schaefer's camp. I asked what salary they would give us to go in the kitchen and run it, and was told eighty-five dollars between us, forty-five dollars for the old man and forty dollars for me. I went out of the tent and told the old man, and he said, ' I won't go in for less than ninety dollars.' They wouldn't give us more than eighty-five dollars, so the old man said, ' Well, you can stay if you want to, but I won't stay for that ; there are lots of men here, and it is pretty hard work, and I am not going to stay for less than fifty dollars.' He went off, but I stayed to work in the kitchen at forty-five dollars a month. I worked there three or four days and got so sick I could not work. I told Mr. Stevens I was sorry to disappoint him so, and he said, ' If you are sick, you will have to take care of yourself.' So I got my time for the three or four days I had been there. I sold Mr. Stevens a watch while I was there. I got the watch in St. Louis. I paid six dollars and got eight dollars for it. At that time I had money. I had between sixty and seventy dollars besides what I drew from the company at Schaefer's camp. That is what I had left of my earnings at Keene Brothers' camp and some little transactions I had with watches. I had four watches I got to trade with. When I left Schaefer & Nichols, I went to St. Louis and doctored myself up a few days. Going up Broadway one day I met Mac. We

sat down on the court-house steps and had some conversation. We met there two or three days after that. I told him I was going to Ohio, and he said, 'You had better go out and see if we can get a job.' I did not know as I would be able to work, but we went out to see if we could secure a position. We went to Labadie on October 22. I remember the date from the fact that I have been charged with something to make me remember it. We went out on the number five passenger train and arrived at Labadie at about nine o'clock. I don't remember on which side of the train we got off, nor do I know positively who we first met. I saw Mr. North, Dr. Luce, and Mr. Keene. I shook hands with Mr. Keene, and he asked, 'Where are you going?' I think I told him we were going down to see about a job. He smiled, made me no reply, and went about his business. I do not really know whether I had a conversation with Mr. North or not. I spoke to him, and he may have asked me where I was going, and I may have told him where. Dr. Luce asked me where I was going, and I told him down the line to see about getting a job at Schaefer's. He said he did not think it necessary for me to go, as he had been at the camp the day before, and the bookkeeper had told him that I did not give satisfaction when I was there previously. I remarked : 'I don't know as I can do anything more than go down and see.' We started out of Labadie on the Fiddle creek road, and on the way down I saw James C. North on a horse going up the road. We were about one hundred or one hundred and fifty feet apart at the time. His horse was going on a trot. I spoke to him. The old man's leg was sore. It crippled him some, so we walked along very leisurely. I had a valise and an overcoat. My overcoat was on when we met North. The old man also had a valise. I noticed a bridge where the old man is said to have been murdered, but I paid no attention to it. I noticed we walked along a bridge, but

we did not stop there. The first place we stopped was opposite the vineyard, near Mr. Meyer's, or Worthington's, house. I am not acquainted with the names of the people down there, but it was there where we stopped. We sat down a little while, and I told him what Dr. Luce had said to me at Labadie, and then the old man said, ' If we can't get any job, it's no use to go down, as it is a good distance.' So he concluded to go back to Labadie and see Mr. Keene about a situation. ' Well,' I said, 'I will go on down to Utter's and see those parties and get some one to take me to Pacific.' I bid him good-bye, he turned to go back towards Labadie, and I went towards Utter's. That is the last I saw of him. I kept right on the road. The first parties I met after leaving the old man were Mr. Reed and his son. I spoke to them as I went by. This was a little before eleven o'clock. I then went on to Mr. Utter's. I had some conversation with Mr. Utter. After that I spoke to the young man who testified here yesterday about trading watches, I don't know his name; it was Mr. Calvin, as you call my attention to it. It was eleven o'clock when I got to Mr. Utter's. We talked about trading watches, and I noticed the time then. We did not trade, and I went over to the tent of those Jews in Mr. Utter's yard. I was acquainted with them, and I talked a few minutes with them. I asked them concerning the expressman who was hauling passengers and vegetables to Keene's camp—if he was gone, as I wanted to go to Pacific with him. I think they said he had already gone. I bid them good-bye and went off towards Mr. Staples'. I had on a nice coat, and the Jews looked at it, as was natural for them. I don't know anything about going out and looking over myself. Yes, sir; I'm a little inclined to be neat, and I like to have good clothes. That was a dusty day—the roads were dusty. It is likely I was at Utter's half an hour altogether. I got to Mr. Staples' about twelve o'clock, I think, for

they were eating dinner when I arrived. I spoke to Mr. Staples about taking me to Pacific. I was slightly acquainted with Mr. Staples, and I picked up a cup and went to the water-bucket, and I got a smell of the water and took some in my mouth, and there was sulphur in the water, if I remember right; at least, it had a bad taste of some kind, and I stepped to the door and threw it out, and I may have made the remark that the water didn't taste right. I made arrangements to be taken to Pacific. It was likely half-past one when we left Mr. Staples'. Staples, Jr., took me to Pacific. It was a very rough road, and we went in a big farm wagon with four horses and made very slow progress. On the road I told the young man I was afraid we would miss the train. I told Mr. Staples I did not know for sure whether I would go to the Indian Territory or to Ohio. I believe I consulted him about the trains. He told me the best he knew. We got to Pacific in the neighborhood of three o'clock. The boy went with me right to the depot, and I went to the 'Frisco office and also to the Missouri Pacific office and asked them when the trains would come in. After that I asked the boy if he would play a game of pool, but he declined. After the boy left, I went over to Mrs. Langerbacher's and asked if she could give me something to eat. She got me up some supper, I ate, paid her for it, and then went back to the depot and staid there a long time waiting for a train; was told at the office that the Missouri Pacific train was behind time, and for that reason I took a 'Frisco train, it being the first one in. If I bought a ticket, I don't remember it, as I very seldom buy a ticket anyway. I talked to the station agent several times; may have inquired at the 'Frisco window twice. I stayed in St. Louis until next morning, and then I went to Cincinnati, paying ten dollars fare. I am not positive how much money I had when I got to St. Louis, but in the neighborhood of eighty or ninety dollars. I had all my

money from my summer's wages, except a few dollars for expenses which you can estimate very easily. I had to pay board and lodging in St. Louis and for medicine, and that is about all the expenses I had. I smoke cigarettes. I am not in the habit of drinking—never drank in my life."

The trial resulted in a verdict of guilty and the defendant appeals to this court, alleging numerous errors. The evidence has been set down thus at large because it is altogether circumstantial, and it is insisted that it does not support the verdict; and because the action of the trial court in giving and refusing instructions, and in its other rulings, may be the better understood.

I. Much of the testimony of Hartley was wholly inadmissible. It related to the commission of another crime, *i. e.*, horse-stealing; a crime entirely disconnected from that with which defendant was charged, and for which he was being tried. The rule is certainly as absolute in criminal as in civil cases, that "the evidence must correspond with the allegations, and be confined to the point in issue." 1 Greenl. Evid., secs. 50, 51, 52; *Iron Mountain Bank v. Murdock*, 62 Mo. 70. The admission of evidence of such collateral facts would be to oppress the party implicated by trying him on a case for preparing for which he had had no notice; tend to prejudice the jury against him, by the disclosure of extraneous crimes; would injuriously prolong the trial; becloud the real issue; divert the attention of the jurors from the *gravamen* of the accusation, and tend to cause their verdict to be taken on side issues, issues wholly foreign to the charge. Whart. Crim. Evid., sec. 29, *et seq.; State v. Martin*, 74 Mo. 547; *Bank v. Murdock*, *supra*. In order that evidence of facts, otherwise extraneous, shall become relevant and admissible, it is necessary that those facts should be such as to shed light on the charge then being tried; to show that

the apparently collateral criminal act is not collateral; but a part of a common system with the criminal act then under trial, and to establish such a visible connection between them; so link them together by the chains of testimony as to tend to show that he who did the act offered to be proven, also did the other for which he is then being tried. *Ex gr.*, that a prisoner charged with and on his trial for murder, stole a horse to go to the scene of his crime, or a weapon with which it was committed, or an instrument with which its perpetration was concealed, or by which his escape was effected. *State v. Lapage*, 57 N. H. 245; Whart. Crim. Evid., sec. 29, *supra; Griffiths v. Payne*, 11 A. & E. 131; *Cole v. Commonwealth*, 5 Gratt. 696; *Coleman v. People*, 55 N. Y. 81; 6 Cent. Law Jour. 403; *Shaffner v. Commonwealth*, 72 Pa. St. 60; Best's Evid. (Chamberlayne) sec. 6. There was no such obvious connection, or indeed any connection whatever, between the subsequent horse-stealing and the previous murder. There was no relationship between them. Evidence that defendant had committed a murder in Missouri would have been just as relevant in Ohio when the defendant was on his trial there for stealing horses.

II. And the objections of the defendant were sufficiently specific. It is quite evident that the testimony of Hartley related not to *one*, but to *many* conversations; to a series of them; conversations extending during a period of weeks; in short, a ceaseless tide of words. If there had been but *one* conversation offered in evidence, and that had related to the commission of the crime for which the defendant was being tried, and in the same conversation he had made admissions. of another crime, all of the conversation would have been admissible, as it would have been impossible to have separated the admissible from the inadmissible, and consequently, the whole conversation must have been

received ; and the rule announced in *State v. Underwood*, 75 Mo. 230, would apply. But it is to be noticed that in this case there was no admission by the defendant, in any of the alleged conversations, that he had committed the crime for which he was then upon his trial, as was the fact in *State v. Underwood, supra.* And the alleged reasons of the defendant for stealing horses were equally as irrelevant as his admission of the crime itself. Testimony of reasons prompting him in that case were just as irrelevant, just as inadmissible, as if he had stated that, seeing the statement in the newspaper referred to, he had been led thereby to commit *arson.*

III. It is to be further noticed that in none of the conversations can the defendant be said to have made any *confession* of the crime which is the basis of the present prosecution. A person's admission or declaration of his agency or participation in a crime, or in other words *a confession,* is limited in its precise scope and meaning to the *criminal act itself* for which the confessor is then on his trial. It is not an admission of a fact or circumstance from which guilt of that crime *may be inferred. State v. Red,* 53 Iowa, 69 ; *State v. Parton,* 49 Cal. 632 ; 1 Greenl. Evid., sec. 170 ; 3 Am. & Eng. Cyclop. of Law, 439, and cas. cit. These remarks are sufficient to condemn the fourteenth instruction, which is in these words :

"14. The jury are instructed that the confessions and admissions of the defendant are competent evidence, but are in themselves insufficient to convict the defendant, unless corroborated by other evidence, which considered with such alleged confessions will satisfy the jury beyond a reasonable doubt that the defendant is guilty of the crime charged."

Similar instructions were condemned in *State v. Red, supra.* There is absolutely nothing in the conversations testified to by Hartley that assumes the shape of an acknowledgment of his guilt.

IV. But such portions of Hartley's testimony as related to the defendant's requesting him to assist him in escaping from the jail in which he was then confined on the present charge, were admissible and properly received. Such testimony rests upon the same footing as escapes or attempts to escape. *State v. Williams*, 54 Mo. 170, and cas. cit. ; Whart. Crim. Evid., sec. 750, and cas. cit.

V. For the reasons just stated, testimony was admissible that the defendant admitted that he had attempted to break jail in Ohio, on learning that he was to be brought back to this state.

VI. Relative to alleged statements of the defendant to Hartley, that he knew McVickers had a large sum of money in a belt upon his person, such testimony was admissible, as tending to show a motive for committing the crime.

VII. The objection of the defendant's counsel to the introduction of Noelke's testimony should have prevailed. The mere fact that he did not take an active part in facilitating his transportation to a distant state afforded no ground for unfavorable presumptions against him, or tended in the least to shed any light on the charge on which he was tried. Its only tendency was to prejudice the jury against him, and should not have been admitted.

VIII. The prosecuting attorney, in his opening statement, made the following remarks : " Jackson was traced up by our sheriff and found in the state of Ohio and brought here. It seems that the gentleman had denied his identity there, and · it necessitated witnesses being brought to Ohio and showing that he was the man that had been here in Missouri. He was then under the charge of another crime." To all of which defendant then and there objected and excepted as being improper. Thereupon the court told the jury to disregard the statement of the prosecuting attorney, and not to

permit it to influence their minds. To which remark of the court defendant objected and excepted, on the ground that the remarks had already done the harm intended. Whereupon the prosecuting attorney further proceeded with his opening statement to the jury, in which he used the following language : "After he was turned over to the sheriff in Ohio he volunteered the statement that, upon hearing through newspaper reports, that he was charged with the crime of murdering McVickers, that he got so excited that he did not know what to do, and then went to horse-stealing to pacify his mind." To all of which defendant duly objected and excepted at the time, as being improper.

There is no evidence in this record that the defendant denied his identity when in Ohio, and as evidence of the commission of another and independent crime was inadmissible, so likewise, any allusion to such inadmissible evidence was equally inadmissible. It is true when the prosecuting attorney made the first remark aforesaid, the court, upon objection made, told the jury to disregard it, and not to let it influence their minds ; but all those who have ever engaged in active practice know how difficult it is for the court, by some such simple reprimand, to eradicate from the memories of jurors the evil of such illegitimate statements ; like the tares, mentioned in Holy Writ, which the enemy sowed whilst men slept, they become as ineradicable as the good wheat of legitimate testimony, among which their mischief-bearing seeds are cast. Besides, the prosecuting attorney made the second of those statements, and received no rebuke whatever. In arguing to the jury on the merits of the cause, the prosecuting attorney again repeated the substance of the second remark already quoted, and objections were made to it in vain. In his closing remarks to the jury the prosecuting attorney also said : "*Escape of criminals at the hands of juries brings on lynch law,*" to which remark due exception

was taken.    Such remarks should not be tolerated. in a court of justice.    No attorney, whether for the state or for the prisoner, has a right to travel outside of the record, and *de hors* the evidence, appeal to improper motives, and invoke a verdict on anything else but the evidence adduced.    The case of *State v. Emory*, 79 Mo. 461, has been cited by the prosecution, as giving countenance to such appeals to the jury; but it does nothing of the kind; that case only sanctions just and fierce invective when based upon the facts in evidence, and all legitimate inferences therefrom; it goes no further.

In *State v. Kring*, 64 Mo. 591, the circuit attorney made the following remarks: "If you wrong the accused by finding him guilty, that wrong can be righted, because there are two courts above this, in which the accused can have this reversed; the court of appeals and the Supreme Court. If you are not justified in finding this man guilty, it is in their power to rectify any error; while, if, on the other hand, you turn the murderer loose in the community, no matter how frail might be the scaffolding, it takes him forever in the light of freedom again; you will make a wound in this community that will never be healed." Passing upon these remarks, this court said: "The statement that the higher courts referred to had the power to review the finding of the jury on the weight of evidence was calculated to induce the jury to disregard their responsibility. * * * The judge presiding at the trial, in our opinion, should not have permitted such remarks to be made, on the close of the argument, without a prompt correction."

The only difference between the case referred to, and the one at bar is, that in the former, an attempt was made to induce the jury to find a verdict of guilty upon the ground that if they committed any error it would be corrected by an appellate court, while here, a similar attempt was made to induce a verdict of guilty,

by an intimation amounting almost to a covert threat, that if they failed to find a verdict of guilty *their* error would be corrected by an *outside tribunal* acting independently of, and in defiance of, all law. Language fails to express in terms sufficiently strong the condemnation which should always promptly attend the utterance of such unworthy words, when a human being is on trial for his life before a tribunal organized for the purpose, *and for the sole purpose, of administering the law.* Improper language of prosecuting attorneys has frequently been made the basis of severe animadversion by this court. *State v. Mahly,* 68 Mo. 316; *State v. Lee,* 66 Mo. 165; *State v. Reed,* 71 Mo. 200; *State v. Martin,* 74 Mo. 547. See also, *Cross v. State,* 68 Ala. 476; *Brown v. Swineford,* 44 Wis. 282. Because of the foregoing remarks by the prosecuting attorney, the judgment should be reversed.

IX. But the prosecuting attorney was within the bounds of legitimate argument when he referred to the failure of defendant to deny that he had made certain admissions to Hartley. In so far as Hartley's testimony was admissible, it was competent for the prosecution to comment on the failure of the defendant to contradict or deny it. A defendant in a criminal cause, when he takes the stand as a witness, is, aside from certain statutory provisions, upon the same footing as any other witness in a civil or criminal cause. His failure to deny damaging statements of other witnesses, alleged to have been made to them by him, or to explain prominent and damaging facts peculiarly within his own knowledge and under his own control, is a fit subject to be commented upon, and for unfavorable inferences to be drawn from such failure. *State v. Anderson,* 89 Mo. 312, and cas. cit.; Whart. on Crim. Evid. (9 Ed.) secs. 435a, 681.

In New York, the statute provides that, upon the trial of all indictments charging a criminal offence, the

person charged shall, at his own request, but not otherwise, be deemed a competent witness, but that the neglect or refusal to testify shall not create a presumption against him; and in passing on that statute, Grover, J., said: "The general rule is, that when it appears that a party charged with the commission of a crime has the power, if innocent, to explain a fact or circumstance tending to show his guilt, fails to give such explanation, such failure may be considered as a circumstance against him. In the present case, the question is, whether his failure to give any explanation of such a fact or circumstance, which he could do if innocent, when testifying in his own favor, he having requested to become a witness, comes within this general rule. The argument in behalf of the accused is, that he cannot be made a witness at all, except by his own request, and that his failure to be a witness shall not create any presumption against him, and that if he requests to be a witness and becomes such he need give testimony only as to such parts of his case as he may choose; and as to other parts, as to which he does not request or desire to give testimony, no presumptions can be created against him for his failure to testify. In this construction I cannot concur. True, it is at the option of the accused whether or not to become a witness. When he has exercised this, and become a witness, he is made competent for all purposes in the case; if, by his own testimony, he can explain and rebut a fact tending to show his guilt, if innocent, and he fail to do so, the same presumption arises from his failure that would arise from a failure to give the explanation by another witness, if in his power so to give it. The reason for the presumption is alike in both cases. It arises from the known desire of parties to explain or repel accusatory evidence against them, if in their power; and the basis of the presumption is, that the case shows that it is in their power if innocent. Hence,

a failure tends to show an absence of innocence." *Stover v. People*, 56 N. Y. 315. Under the provisions of just the same statute, a similar ruling has been made in Maryland. *Bradshaw v. State*, 58 Md. 563.

Section 1918, Revised Statutes, does but announce the rule generally prevalent throughout this country that the right of cross-examination does not extend to the whole case, but is restricted to matters touched upon in the direct examination. Best's Evid. (Chamberlayne), sec. 644 and notes. The legislature, by pointing out in section 1918, *supra*, just how far the right of cross-examination shall extend, thereby established a *single exception*, and leaves a prosecuting attorney the same latitude of comment as to all things else, save those expressly included within the terms of the exception itself. And to this statute the familiar maxims, *"expressio unius,"* etc., and "affirmative specification excludes implication," apply. Potter's Dwarris, 655; *Maguire v. State Savings Ass'n*, 62 Mo. 344. In short, the right of the prosecution, as towards a defendant witness, is limited alone by the statute; and consequently, the right to unfavorably comment upon the failure of such witness to testify as to matters within his own knowledge, is just as broad and as clear as his right to exemption from unfavorable comment when he abstains altogether from asserting his statutory privilege. Cooley Const. Lim. [3 Ed.] 317, and notes. Section 1919, Revised Statutes, bears out the same idea; because that section provides that if the accused *shall not avail himself of his right to testify*, that such failure shall not raise any presumption of guilt, nor be referred to, etc. In this case the defendant *did avail himself of the right to testify*, and, therefore, comments not forbidden by the statute were legitimate. The discussion of this point has been lengthened because of the frequency of its occurrence in criminal practice.

X.   The tenth instruction is in these words:

"10.   In law a person accused of crime is presumed to be innocent.   This presumption entitles him to an acquittal unless it is overcome by evidence which establishes his guilt beyond a reasonable doubt.   A juror is understood to entertain a reasonable doubt when he has not an abiding conviction to a moral certainty that the party accused is guilty as charged.   You should acquit the defendant if you entertain a reasonable doubt as to his guilt, and you *should also acquit if it is as reasonable, considering all the facts or circumstances proven, to conclude that he is innocent, as to conclude that he is guilty*, or if all the facts and circumstances can be reasonably reconciled with any theory other than that of his guilt.   A doubt, to authorize an acquittal, however, should be reasonable and substantial, and one fairly deducible from the evidence considered as a whole ; a mere possibility that the defendant may be innocent will not warrant a verdict of not guilty."

This instruction is erroneous.   I have italicized the erroneous portion of it.   That portion announces the same rule that prevails in civil cases, a rule obviously inapplicable to those of a criminal nature.   An instruction, substantially identical with the one under consideration, was condemned for a similar reason, in *State v. Schaeffer*, 89 Mo. 271.   It is true the next instruction, the eleventh, gave the jury the correct rule as to what evidence would authorize a conviction, in a criminal cause ; but it is impossible to tell what injurious effect the tenth instruction had upon their minds, or which instruction they took for their guide.   *Gay v. Gillilan*, 92 Mo. 250 ; *State v. McNally*, 87 Mo. 644 ; *State v. Simms*, 68 Mo. 305 ; *State v. Mitchell*, 64 Mo. 191 ; *Frederick v. Allgaier*, 88 Mo. 598.

XI.   The fifteenth instruction, in regard to flight raising a presumption of guilt, is unobjectionable and left the matter very fairly to the jury to determine

whether the defendant had really fled the country or not.

XII.   Nor is there any objection to the sixteenth instruction which authorized the jury to take into consideration any attempts made by defendant to secure tools so as to make his escape from the Franklin county jail.

XIII.   I see no error in failing to instruct upon the point of an *alibi*.   There was no evidence to warrant such an instruction.   The defendant, nor any one else, testifies as to *when* McVickers was killed, nor where defendant was at that time.   Besides, an *alibi* was not made an affirmative defence.   *State v. Murray*, 91 Mo. 95.   I discover no ground for just criticism as to the action of the trial court as to giving or refusing other instructions.

XIV.   I come now to a matter which has given me no little trouble; it is whether the evidence supports the verdict; it is insisted that it does not.   In order to determine this point, I have read this voluminous record with the most patient attention, and after doing so, I am free to confess that there is a great deal of mystery connected with the murder of McVickers; for murdered he undoubtedly was; suicide is out of the question. It seems to be quite certain that whoever did or was concerned in the murder made the tracks leading down to the pool of water under the bridge where the satchel of the deceased, broken open, was found; but the careful measurements of those tracks do not seem to conform to the length of the defendant's foot.   But suppose that *two* were engaged in the murder?   Again, it seems difficult to believe that if the defendant alone did the murder and cut the throat of the deceased, how it was that his clothes were not covered with blood, that is, if the blood gushed freely from the gaping wound in the throat; but defendant's clothes were free from any appearance of bloodstains, or of any appearance of bloodstains having

been recently removed.   But suppose that, according to Dr. Martin's theory, the flow of blood was retarded in consequence of the fatal effect of the gunshot wound in the head?   Or suppose, according to another theory, that the blood did gush freely, but that the defendant was provided with *another suit* of clothes, which he changed, placed the blood-stained suit in his satchel, and put on the clean suit?   Or suppose further, that two of the three shots fired pierced the heart of the victim, and thus, by internal hemorrhages, drew off a large portion of the vital tide ( and it does not appear that any examination was made to ascertain if any of the shots entered the body of the deceased ); then this may account for the fact that if the defendant did the murder, that his clothing showed no external indications of it.. And if he really committed the crime, and committed it at ten o'clock, there was, it seems, time enough for him to have done so, and still reached Reed's Landing, about one and three-fourths miles to the eastward, by eleven o'clock.

My impression from reading the testimony is, that McVickers was seated upon the northeast corner of the bridge when shot; that he may have been shot in the body twice ; perhaps in the head last, then thrown into the gully, but about two and one-half feet away, when his throat was cut.   But still this impression must be at fault, if the blood gushed freely when the throat was cut, because no one pretends that any indications of blood were seen on the sides of the gully or on the brush at the sides of the body.   But leaving this branch of the subject:  it is shown (1) by the testimony that the defendant was impecunious;  "*broke*," only about a week before the twenty-second of October ; (2) that he was aware that the deceased was the possessor of a considerable sum of money ; (3) that he was in proximity to the scene of the crime; *i. e.*, within a quarter of a mile from where it was committed ; (4) that he was

with McVickers, so far as the testimony shows, when last seen alive ; and, by his own admission, crossed the bridge with him ; (5) that though intending, as he says, to return to Ohio, he tried to create the impression upon the mind of Staples that he intended going to the Indian Nation ; (6) that he endeavored to induce Hartley to supply him with tools; so that he could break jail ; (7) though aware, when at Labadie, that he could not get employment at Schaefer's camp, still, according to his own story, he allowed McVickers, who had an abscess on his leg, to travel, as he stated, to Meyer's vineyard, a distance of three miles from Labadie, before he informed him of what Dr. Luce had told him, that it would be needless to go to Schaefer's camp for work ; (8) that he told a falsehood about having secured work for himself and McVickers at Schaefer's camp ; (9) that though he left St. Louis and went to Labadie in search of work, yet that, after being disappointed in his expectations of getting work at Schaefer's camp, he still neglected to avail himself of the opportunity of securing employment at Keene's camp, but a short distance away, when informed by Marquitz that he could secure employment there. When all these things are taken into consideration as well as defendant's actions at Staples' place, on the way to Pacific, and when he arrived there, I am not prepared to say that there is no evidence to support the verdict, or that this court ought to interfere on that account. And I say this the more readily because, when the cause goes back to the lower court, the testimony may take on a different and more satisfactory shape, either in favor of innocence or in favor of guilt, when the cause shall have been more thoroughly tried.

To that end, the judgment will be reversed and the cause remanded. All concur in reversing the judgment ; but their concurrence is based on various grounds, as hereinafter indicated : As to paragraphs I. and II., no

O'Hare v. Chicago & Alton Ry. Co.

one agrees with me. In paragraphs III., IV., V., VI., and VII., all concur. In paragraph VIII., Black and Brace, JJ., concur. As to language in regard to "escape of criminals," Norton, C. J., and Ray, J., dissent, as. to whole of paragraph. In paragraph IX., Brace, J., alone concurs. In paragraph X., Ray, J., alone concurs. In the remaining paragraphs all concur.