The State v. Parker.

# THE STATE v. PARKER, *Appellant.*

1. **Criminal Law:** PRACTICE: EVIDENCE. In a criminal prosecution, all independent matters and independent crimes, disconnected from the crime then under investigation, and which throw no light upon the alleged criminal transaction, should be rigorously excluded, since such testimony only tends to distract the attention of the jury from the real issues in the cause and fill their minds with prejudice against the accused.

2. ———: ———: IMPEACHMENT OF DEFENDANT AS A WITNESS. Evidence of the character of a defendant while living in another state, more than twenty years before the trial, is inadmissible for the purpose of impeaching him.

3. ———: ———: ———. Where he had lived in the neighborhood where the crime was committed for twenty years, inquiry as to his character should have been confined to such neighborhood.

4. ———: ———: CHARACTER. The character of a person in the neighborhood in which he lives consists in the opinion and estimation of his neighbors in regard to the traits of his moral character. An instruction that character consists in the general estimation of the community is too comprehensive and wide in its scope.

5. ———: ———: DEFENDANT AS A WITNESS: IMPEACHMENT. When a defendant testifies in his own behalf, testimony as to his general moral character is admissible. In such case, he occupies the same attitude as any other witness, and may be impeached in the same manner.

6. ———: ———: DYING DECLARATIONS. Dying declarations should be restricted to the act of killing and the transactions immediately attending it and forming a part of the *res gestae.* Such declarations, which constitute the mere opinion of the declarant, should not be received.

7. ———: ———: ———: EVIDENCE. Where the dying declarations make out a case of lying in wait for the deceased, anything in corroboration of these declarations is admissible.

8. **Evidence:** OPINION. Where the opinion of a witness as to the appearance of an object which he has seen is the only evidence attainable, it is not inadmissible because it is a mere opinion.

The State v. Parker.

9. ———— : IMPEACHMENT, FOUNDATION FOR. A witness should not be impeached by showing what he swore to at a former trial without first laying the foundation as to time and place.

10. **Election of Special Judge**: CALLING IN JUDGE OF ANOTHER CIRCUIT. Where the regular judge is disqualified, and two special judges have been elected, both of whom decline to serve, the court may set the cause for trial and call in the judge of another circuit to try it.

11. ———— : ————: CHANGE OF VENUE. In such case, the judge requested to sit properly refuses an application for a change of venue upon an affidavit of prejudice against him.

12. **Criminal Law**: SELF-DEFENSE : INSTRUCTION. One who brings on a difficulty for the purpose and with intent to kill another or do him great bodily harm, and who does in the progress of such difficulty kill such other cannot avail himself of the doctrine of self-defense. (*Affirming State v. Gilmore*, 95 Mo. 554).

13. ———— : ————. If, however, the defendant begins the quarrel or provokes the difficulty, but with no felonious purpose, and the deceased attacks him and compels him to kill the deceased in order to save his own life, the defendant will be guilty of manslaughter in the fourth degree. (*Affirming State v. Gilmore*, 95 Mo. 554).

*Appeal from Buchanan Criminal Court.* —Trial before
HON. C. A. ANTHONY, Judge of the Twenty-
Ninth Judicial Circuit.

REVERSED AND REMANDED.

*Ramey & Brown* for appellant.

(1) After the application for change of venue had been filed the judge of the Buchanan criminal court had no jurisdiction to make any order in said cause except to grant the change and order an election for a special judge, as provided by section 1878, Revised Statutes, or, if in his opinion, at the time the application is granted the cause is of the character contemplated by section 1881, Revised Statutes, he need not order an election, but may request the judge of some other circuit to hear the cause. R. S., 1879, secs. 1878, 1881. Having granted

The State v. Parker.

the change and ordered an election the judge could not legally go upon the bench seven or eight days afterwards, call the case and set it down for trial and request the judge of his own selection to try the cause. Such action would not give the judge so called jurisdiction of the cause. See *State v. Shipman*, 93 Mo. 147. (2) The only issued to be tried before said C. A. Anthony, upon the application for a change of venue, was whether or not the inhabitants of Buchanan county were prejudiced against the defendant so as to prevent his having a fair trial. *State v. Burgess*, 78 Mo. 234. (3) The evidence as to the post presented several issues to the jury that were not properly in the case, and was calculated to do the defendant great harm. "The horn books of the profession announce the doctrine that 'the evidence must correspond with the allegations and be confined to the points in issue.'" *State to use v. Roberts*, 62 Mo. 390. In criminal cases the necessity is stronger, if possible, than in civil cases, of strictly enforcing this rule. See 2 Russell by Greaves, p. 772 ; 1 Phill. Ev. [7 Ed.] 178 ; Roscoe's Crim. Ev. 81 ; 1 Greenl. Ev. sec. 50 ; *State v. Umfried*, 76 Mo. 404. (4) The statement of witness Harper as to what, defendant told him the day before the homicide about the post should have been excluded. It did not tend to prove any issue in the case and was calculated and intended to draw away the minds of the jury from the issue, to mislead them and to excite prejudice against the defendant. See 1 Greenl. Ev. sec. 52 ; *State v. Umfried, supra.* (5) Dying declarations are only admissible in evidence when the death of the deceased is the subject of the charge and the circumstances of the death are the subject of the dying declarations. Roscoe's Crim. Ev. 28, 32 ; 1 Greenl. Ev., sec. 156 ; 1 Stark. Ev. 32 ; *Brown v. State*, 46 Ind. 311 ; *State v. Montgomery*, 3 Crim. Law Mag. 523 ; *State v. Jefferson*, 77 Mo. 136.

*B. G. Boone*, Attorney General, for the State.

(1)   Where testimony is offered, for and against a motion for a change of venue on account of the prejudice of the inhabitants of a county, and the motion is overruled, this court will not interfere with the action of the trial court unless palpable injustice to the defendant is manifest from the record. *State v. Guy*, 69 Mo. 430 ; *State v. Burgess*, 78 Mo. 234 ; *State v. Brownfield*, 83 Mo. 448 ; *State v. Wisdom*, 84 Mo. 184 ; *State v. Wilson*, 85 Mo. 134 ; *State v. Holcomb*, 86 Mo. 381.   (2)   It was sufficient that the jurors disclaimed bias or prejudice when examined on their *voir dire* as to opinions formed on the issue to be tried and upon the question of the guilt or innocence of the accused.   R. S. 1879, sec. 1897 ; *State v. Brooks*, 92 Mo. 542.   (3)   The statement of David C. Montgomery made to members of his family and others after the shooting and before his death, were clearly made *in extremis*, and were admissible as dying declarations. 1 Greenl. Ev. secs. 156 and 162 ; Whar. Cr. Ev. [8 Ed.] sec. 276 ; *State v. Jefferson*, 77 Mo. 136 ; *State v Vansant*, 80 Mo. 67 ; *State v. Chambers*, 87 Mo. 406 ; *State v. Partlow*, 90 Mo. 608.   (4)   The admission of evidence, by the trial court, as to whether the post and wire, in controversy between Parker and Montgomery, were in a public road or a private way, did not prejudice defendant, and he will not be heard to complain.   *State v. Holme*, 54 Mo. 160 ; *State v. Grate*, 68 Mo. 22.

SHERWOOD, J.—The defendant, indicted for the murder of Davis C. Montgomery, was convicted of the offense of murder in the second degree, and he appeals here, alleging many errors.  The history of the homicide, as disclosed by the record, whether favorable to the prosecution or favorable to the defense, is as follows : The deceased and the defendant, both farmers, lived on

adjoining tracts of land in Center township, Buchanan county, Missouri. A misunderstanding had arisen between them in regard to a post, which, it is said, defendant had set in the public road, and connected it with a barbed-wire to his line of fence, so as to render it inconvenient for Montgomery to reach his house by way of a private road leading into the public road. On Sunday, May 23, 1886, the deceased and the defendant met in the public road in front of defendant's farm and about one-eighth of a mile from their respective houses. On meeting each other, they had some conversation in regard to the removal of the post, when an altercation arose between them, which resulted in Montgomery being shot by defendant and killed.

When the wife and sons of Montgomery reached the scene of the homicide, he was found lying on the ground unable to rise; his face was cut and he had a gun-shot wound through one of his lungs. He said to his wife that he was bound to die ; that he was not long for this world ; that Gaines Parker and Frank Parker had waylaid him. After shaking hands with all, he said again, he must die. "He then prayed God to forgive his sins, and have mercy on his wife and children, and enjoined his two elder sons to be good boys and take care of their mother and the little children ;" continuing in regard to the difficulty he said that Gaines Parker, the defendant, had met him in the road and said : "I see you are trying to get into trouble with me about that wire?" Deceased replied: "No, I am not, I don't want any trouble with you ; " Parker then said : "You want the wire moved, do you?" To which deceased replied : "I don't think that it is any more than right that it should be moved, but I don't want any trouble with you ; I am sorry that I ever had ; I would not have had if you hadn't said that Joe (deceased's son) had no character ;" the defendant then said to the deceased, that Frank (defendant's son)

was not far off, and "that we [defendant and son] are here watching for you;" defendant then called his son, who came running out of the brush near by with a club and some stones, and he struck deceased on the head, stunning him and knocking him down, after which, while he was yet down, Frank, the son, kicked him in the face; deceased said he would surrender, but defendant drew out a pistol and shot him, and turned and shot at a small boy, one of the sons of the deceased, who came up during the difficulty and struck at defendant with a small steel trap which he carried in his hand; deceased having been shot through the lungs, spoke slowly, and with great difficulty, and a half hour or more was consumed by him in stating the above facts; his family insisted on taking him home, but he said he could not be moved, that he would have to die right there on the ground; he was put in a wagon, however, and hauled to his residence about one-eighth of a mile distant, where he died at twelve o'clock m. of that day, from the gun-shot wound inflicted by defendant.

The evidence on the part of defendant was to the effect that upon the day of the difficulty, he and deceased met in the public road and entered into conversation as before stated; that upon defendant giving deceased the lie in response to some charge the deceased made, the deceased knocked him down, and inflicted on him such serious personal injuries as to cause him to call on his son Frank, who was then at his father's house half a quarter of a mile distant, to come to his assistance; that Frank's attention was called to the cries of his father for help by his mother, and that he immediately ran to the place of the difficulty, and when he got there he saw his father lying on his back in the fence corner, with blood running over his face and eyes, and that, at that time, the deceased, Montgomery, was on his father with his knees planted on his breast and striking him with his fist; that when Frank requested deceased to get off of his father, he refused to do so, but

insisted that Frank should not get over the fence, and for the purpose of preventing him from getting over the fence raised up off of the defendant and pushed Frank from off the fence; that the defendant had been severely injured and was then blinded by the gouging that deceased had given him, and by the blood that was running in his eyes; that when the deceased resisted the attempt of Frank to get over the fence and relieve his father, and refused to get off the defendant, Frank threw a rock which he had picked up on his way to the place of the difficulty, and hit the deceased on the back of the head, and then jumped over the fence and kicked him in the face which knocked him off of his father, and that the defendant then immediately shot; that at about the time that Frank got to the place of the difficulty, Charles and Thomas Montgomery, two sons of the deceased, got there also; that Charles, the oldest one of the boys, had a steel trap in his hands and had hold of the chain of said trap, and was striking and swinging it at the defendant, and that the deceased had hold of the defendant with one hand, and that deceased was striking or shoving at Frank with the other, and that this was the condition or attitude of the parties at the moment the fatal shot was fired by the defendant. He was, at the time of said shot, enfeebled and violently agitated on account of the injuries he had received.

The defendant stated that he honestly believed that it was necessary for him to shoot at the time he did; that he saw Charles Montgomery have something in his hand which he thought was a hoe, and that the deceased had hold of him, and he expected him to be on him again; that he could not see distinctly what Frank was doing or what was going on, and expected to be killed, to prevent which he shot.

I.   The issues in this case were few and simple. The charge was murder. The homicide was admitted.

The plea of defendant was in effect a plea of self-defense.   Under the evidence, the only issues to be tried were :   (a) Was the homicide committed in such circumstances as to constitute murder in the first degree ? or (b) murder in the second degree ? or (c) manslaughter in the fourth degree ? or (d) was the homicide justifiable ?   But, notwithstanding the simpleness of these issues, the state was permitted to introduce testimony wholly outside of the cause and foreign to the issues being tried.   The result of the introduction of such irrelevant matter was to swell this record to the great size of over twelve hundred and fifty closely-written pages.   Of this sort, was testimony that defendant had set the post in the public road ; that he had been notified by the road overseer to remove the same, and had refused to do so.   The only testimony properly receivable in regard to the post would be that it was placed there out of ill-will to the deceased, thus tending to show the harboring of malice towards him.   But obviously, the placing of the post in the public road, if done by the defendant, was a misdemeanor, a separate and distinct offense, wholly foreign and irrelevant to the cause then in hand.   The same remark applies to testimony showing that, at a presidential election some years before, Parker had drawn a knife upon the witness Gann.

Not less objectionable was testimony that about eight years before the trial Parker had been excluded from membership in a certain church.   The only effect of testimony of this character was to distract the attention of the jury from the real issues in the case and to fill their minds with prejudice against the accused.   All independent matters and all independent crimes which are disconnected from the crime then under investigation, which shed no light upon the alleged criminal transaction, are to be rigorously excluded for the reasons already given.   *State v. Tabor*, 95 Mo. 585, and cas. cit. ; *State v. Jackson*, 95 Mo. 623, and cas. cit.

II. An attempt was made to impeach the testimony of the defendant. That portion of the impeaching testimony, however, which related to the character of the defendant when living in Marshall county, Kansas, some twenty odd years before the trial, was inadmissible. It was too remote a period for such inquiries. He had lived at his home in Buchanan county for twenty years, and the inquiries should have been confined to the neighborhood of his then residence. Whart. Crim. Ev., sec. 487, and cas. cit. I do not find that this point has been expressly ruled, but the tendency of the adjudications is clearly in this direction, and sound reason evidently travels the same road.

As indicated by the authorities, the rule is similar in such cases to that which prevails as to collateral facts affecting the credibility of an ordinary witness; in which case, "all inquiries into transactions of a remote date will, of course, be suppressed; for the interests of justice do not require that the errors of any man's life, long since repented of and forgiven by the community, should be recalled to remembrance and their memory perpetuated in judicial documents, at the pleasure of any future litigant." 1 Greenl. Ev., sec. 459. If the rule of exclusion prevails as to an ordinary witness, over whose remote transactions the law will cast the veil of its protecting oblivion, then a fortiori, should equal favor be shown to one whose character for veracity as well as his life or liberty are also at stake, as in the present instance. To permit the prosecution in such a case to rake up the ashes of long-forgotten rumors, in order to overthrow the moral character of a defendant-witness, is at war with public policy as well as common fairness. Such a course, if permitted, would destroy one of the strongest inducements to the reformation of the supposed offender, a matter in which the state has the greatest possible interest. There was error, therefore, in admitting testimony as to defendant's reputation when living in Kansas at the remote period referred to.

III.   And while upon this point of the moral character of the defendant, it may not be amiss to discuss an instruction given on that point; it was this: "The character of a person in the neighborhood in which he lives consists in the general opinion and estimation in which he is held by his neighbors, founded upon their opportunity to observe his conduct." This instruction is not sufficiently comprehensive and accurate. The opinion and estimation of his neighbors must be in regard to the traits of his *moral character*. As, for instance, that he was regarded by his neighbors generally as a thief, or regarded as an honest man, etc. The instruction in question is too wide in its scope. The fact that a man, in the general estimation of his neighbors, is regarded as a "stubborn, contentious man in politics, in church or in his school district," would not have the slightest bearing on the point of his general moral character or reputation in his neighborhood. For this reason it was that the court very properly gave an instruction excluding from the consideration of the jury the statement that the defendant was "a stubborn, contentious man," etc. There was among the witnesses for the state a great wealth of ignorance displayed as to what constitutes the moral character of a person. One of the witnesses seems to have been under the impression that because an individual would not go up to the "*anxious seat*," as long as Parker remained a member of the church, that this fact affected the general moral character or reputation of the latter!

IV.   It is insisted that the state was improperly allowed to introduce evidence as to defendant's general moral character; that the evidence should have been confined to the trait of character in issue. But it must be remembered that the state was attacking the general moral character of the defendant *as a witness*, and upon that footing testimony as to the general moral character of the defendant was undoubtedly competent: This is the well-settled law of this state. *State v. Grant*, 79

Mo. 113, and cas. cit. Where it is sought to impeach by extraneous testimony a defendant-witness, he occupies the same attitude as does any other witness; and the same means may be employed in one instance as in the other.

V. It is claimed for the defense that error was committed in the admission of the dying declarations of Montgomery. There doubtless was error committed as to what he said about the defendant having "waylaid" him, since this statement was the mere opinion of the deceased, and did not fall within the principle of the rule which confines the testimony touching such declarations to a case where the "circumstances of the death are the subject of the dying declarations." But as to the residue of the declarations, I regard them as admissible under the rule laid down in *State v. Draper*, 65 Mo. 335, since the residue of these declarations was restricted to the act of killing and the transactions immediately attending it, and forming a part of the *res gestae.*

VI. If the dying declarations were properly admitted, then no reason is seen why the testimony of Gann was not admissible, to prove that he was in Parker's field the evening after the homicide occurred, and just west of where it took place, and that "the weeds looked like they had been mashed down; looked like somebody had been down on their knees; looked a good deal like a man got down on his feet, the toe of his boot was down there, and the knee, that is about what it looked like; somebody had walked out to the fence." This testimony was admissible, because the dying declarations established that Parker had said that "we came here to watch for you," and those declarations had also established that on Parker calling to his son Frank, the latter "came running up out of the brush with a club and stones, and lots of them." And since the dying declarations made out a case of lying in wait for the deceased, anything in corroboration of those declarations was also admissible.

VII. It is urged that Gann's testimony was incompetent because it was a mere statement of his opinions and conclusions as to what the weeds looked like. This is an erroneous view to take of such testimony. Very frequently the opinion of the witness as to the appearance of an object which he has seen, is the only evidence attainable; but it is none the less competent on that account. *Greenwell v. Crow*, 73 Mo. 638, and cas. cit.

VIII. The prosecution should not have been permitted to contradict Frank Parker, by the testimony of other witnesses as to what he swore at a former trial of the cause, without first laying the proper foundation by asking suitable questions as to time and place, etc. 1 Greenl. sec. 462.

IX. No error occurred in the action of Judge Woodson in relation to the application for a change of venue. Two special judges had been elected, and each one had declined to serve. He therefore, very properly, proceeding under the provisions of section 1881, set the case down for trial, and requested Judge Anthony to try the cause. Nor, under our former rulings, was any error committed by the judge, requested to sit, in denying the defendant a change of venue.

X. In so far as the instructions are concerned, the sixth instruction given at the instance of the state, very clearly recognizes the doctrine laid down in *State v. Hays*, 23 Mo. 287; *State v. Packwood*, 26 Mo. 340, that if the defendant brought on the difficulty, and in doing so was actuated by the design to kill the deceased, or to do him some great bodily harm, and in the progress of the difficulty did shoot and kill him, then there was no self-defense in the case. But the converse of that doctrine, that if the defendant brought on the difficulty but without such felonious intent that then, etc., was not declared in any instruction given. The correct formula for instructions in such cases is laid down in *State v. Gilmore*, 95 Mo. 554.

The judgment is reversed and the cause remanded.

NORTON, C. J., concurs in all the paragraphs of this opinion except the last. BLACK and BRACE, JJ., concur; RAY, J., absent.