## THE STATE v. YOUNG, *Appellant.*

### Division Two, January 31, 1894.

1. **Criminal Practice:** JURORS, QUALIFICATIONS OF. Jurors are properly rejected on the trial panel in a criminal case, who state upon their *voir dire* that they would not convict on circumstantial evidence however strong.

119  495
119  551
119  495
121  145
124  462
119  495
131  394
119  495
132  149
134  253

The State v. Young.

2. ———: EVIDENCE: DEFENDANT'S EXAMINATION AT CORONER'S IN-
QUEST. Testimony of one taken at a coroner's inquest and who
is afterwards prosecuted for the homicide is inadmissible against
him, where it appears he was an ignorant German boy and acted
without counsel and that he was at the time of the examination sus-
pected of having committed the crime and that the examination was
made to obtain criminating circumstances from him.

3. ———: ———: ———: CONSTITUTION. The admission of such evi-
dence would infringe the constitutional provision, "that no person
shall be compelled to testify against himself in a criminal cause."

4. ———: ———: DIFFERENT CRIMES. Evidence of crimes distinct
from the one for which the defendant is on trial is inadmissible
against him.

5. ———: ———: DEFENDANT'S STATEMENTS. Where on the trial of
one for the murder of his father the state shows his presence at the
house of the deceased near the time of the alleged offense, defendant
may show that he told some one that he was going to his father's
house to get his clothes.

6. ———: ———: ———. Defendant's statement to a witness that he
had made a visit to his father's house about the time of the commis-
sion of the offense is admissible in rebuttal of the claim of the state
that the visit was a concealed one.

7. Criminal Law: INTENTIONAL KILLING: MURDER IN FIRST DEGREE.
Evidence of intentional killing is not sufficient to authorize a convic-
tion of murder in the first degree.

8. Criminal Practice: DEFENDANT'S STATEMENTS: INSTRUCTION. An
instruction that if the jury believed that defendant made any state-
ments as to his whereabouts at the time of the killing, they must
consider such statements altogether, that what defendant said against
himself the law presumed to be true and that what he said for himself
the jury might believe or disbelieve as shown to be true or false by
the evidence, is proper.

9. ———: MOTION FOR NEW TRIAL: WEIGHT OF EVIDENCE. The trial
court is, on a motion for a new trial, bound to determine whether the
verdict is contrary to the evidence. (R. S. 1889, sec. 4269.)

*Appeal from Marion Circuit Court.*—HON. R. F. ROY,
Judge.

REVERSED AND REMANDED.

*H. J. Drummond* and *W. M. Boulware* for appellant.

(1) The examination of defendant before the coroner and jury of inquest was not competent evidence against him, and its admission, against objection, was error. *State v. Mullins*, 101 Mo. 514; *State v. Clifford*, 53 N. W. Rep. (Ia.) 299; *State v. Hobbs*, 17 S. E. Rep. 380; *State v. Row*, 46 N. W. Rep. (Ia.) 872; *People v. Mondon*, 103 N. Y. 211; *Day v. State*, 63 Ga. 667; *Wood v. State*, 3 S. W. Rep. (Tex.) 336; *State v. Coffee*, 16 Atl. Rep. 151; *State v. Young*, 1 Wins. (N. C.) 126; *Josephine v. State*, 39 Miss. 613; *People v. McMahon*, 15 N. Y. (1 Smith) 384; *U. S. v. Williams*, 1 Cliff. C. C. Rep. 5; *Clough v. State*, 7 Neb. 320. (2) Defendant's offer of proof by witness Turpening was competent, and its rejection error. The principle is thoroughly recognized by the leading courts of America, that where the inquiry concerns one's intention, not only his acts and conduct, but his declarations made at or about the time when such intention is alleged to have existed, are admissible and have independent competency as evidence. *Com. v. Trefethin*, 31 N. E. Rep. (Mass.) 961; *Ins. Co. v. Hillman*, 145 U. S. 285; *Hunter v. State*, 40 N. J. L. 495; *U. S. v. Penn.* 13 Bankr. Reg. 464; *State v. Garrand*, 5 Or. 216; *Price v. State*, 72 Ga. 441; *Railroad v. Herrick*, 29 N. E. Rep. (Ohio) 1052; *Schlemmer v. State*, 15 Atl. Rep. (N. J.) 836; *Johnson v. State*, 15 S. W. Rep. (Tex.) 647. (3) The judgment of divorce and alimony rendered against deceased and in favor of his wife, was competent evidence, and the rejection thereof was error. The circumstances of the death suggested the theory of suicide, and it is well known that ill health, financial troubles and domestic unhappiness are among the most fruitful causes of self-

destruction. *State v. Leutz*, 45 Minn. 177. (4) The court erred in the instructions given of its own motion. The declaration as to the presumption of innocence is not sufficiently comprehensive. The presumption remained during the trial and deliberation of the jury in aid of the defendant, in determining both the existence of the evidentiary facts and the inference to be drawn from the body of evidence. And the court ought to have so instructed the jury. *State v. Young*, 99 Mo. 666. (5) The declaration concerning the burden of proof is incomplete and defective. It ought to have informed the jury as to the degree of certainty required in the proof of the particular or evidentiary facts to authorize them to be considered as part of the body of the evidence. A fact can not be inferred as the basis of a further inference. It is not permitted to ground an inference upon an inference. *People v. Ah Chung*, 54 Cal. 398; *Harrison v. State*, 6 Tex. App. 42; *Black v. State*, 1 Tex. App. 368. (6) The instruction as to reasonable doubt is erroneous. The instruction in declaring that the doubt must arise from the evidence, withdrew the attention of the jury from the want of evidence of the state, or its weakness, and directed it to the strength of defendant's evidence, as the required source of the acquitting doubt. If it were thought necessary to define the source of the doubt, the instruction ought to have embraced in its terms the weakness of the state's evidence, as well as the strength of the evidence of defendant, as a permissible source. *State v. Woolard*, 111 Mo. 248; *Fletcher v. State*, 17 S. E. Rep. (Ga.) 100; *Hodgkins v. State*, 15 S. E. Rep. 695; *Lewis v. State*, 15 S. E. Rep. (Ga.) 697; *State v. Wells*, 111 Mo. 533; *U. S. v. Newton*, 52 Fed. Rep. (D. C.) 275; *Wright v. State*, 69 Ind. 163; *Densmore v. State*, 67 Ind. 306; *U. S. v. Harper*, 33 Fed. Rep. 471; *Carr v. State*, 37 N. W. Rep. (Neb.) 630. (7) Instruction

number 10, given by the court on motion of the state, was erroneous. According to it, the fact that defendant stated the facts contained in his statements to be true, is not evidence of their truth. *Welsh v. State*, 11 S. Rep. (Ala.) 450; *Welsh v. State*, 12 S. Rep. (Ala.) 275; *Conner v. State*, 34 Tex. 359; *Perego v. Purdy*, 1 Hilton (N. Y. C. P.) 269; *Futch v. State*, 16 S. E. Rep. (Ga.) 102; *Furst v. State*, 47 N. W. Rep. (Neb.) 1116; *Daniels v. State*, 78 Ga. 98; *Jones v. State*, 13 S. W. Rep. (Tex.) 990; *State v. West*, Houst. Crim. C. (Del.) 371; *Slade v. State*, 16 S. W. Rep. (Tex.) 253; *Eiland v. State*, 52 Ala. 322; *Barnes v. Allen*, 1 Abb. App. Dec. (N. Y.) 111; *Griswold v. State*, 24 Wis. 144. (8) The evidence does not sustain the verdict.

*R. F. Walker*, Attorney General, and *Morton Jourdan*, Assistant Attorney General, for the state.

(1) The court did not err in rejecting the challenge of jurors. *State v. West*, 69 Mo. 402; R. S. 1889, sec. 4195. (2) The examination of defendant before the coroner was properly admitted in evidence. *State v. Mullins*, 101 Mo. 514. (3) The testimony of the witnesses Turpening and Burblinger was properly excluded. (4) The judgment of divorce and alimony rendered against deceased was also rightly excluded. (5) The instructions are in the approved form, and rightly declare the law. (6) The evidence supports the verdict. *State v. Richardson*, 23 S. W. Rep. (Mo.) 769; *State v. Herrman*, 22 S. W. Rep. (Mo.) 1072; *State v. Banks*, 22 S. W. Rep. (Mo.) 1079; *State v. Moxley*, 22 S. W. Rep. (Mo.) 575; *State v. Burd*, 22 S. W. Rep. (Mo.) 377; *State v. Jackson*, 106 Mo. 181; *State v. Orrick*, 106 Mo. 111; *State v. Howell*, 100 Mo. 628; *State v. Lowe*, 93 Mo. 547; *State v. Hicks*, 92 Mo. 432; *State v. Gann*, 72 Mo. 374; *State v. Musick*, 71 Mo. 401; *State v. Hammond*, 77 Mo. 158.

GANTT, P. J.—The defendant is charged with the murder of his father, Ludwig Young, on the fifth day of December, 1892. He was indicted at the April term 1893, of the circuit court of Marion county and was tried in June, 1893, and convicted of murder in the first degree. He assigns various errors, which will be examined.

The evidence discloses the following facts: The deceased, Ludwig Young, was a German, thought by some to be between fifty and sixty years of age, by others, much older. Eight or ten years prior to his death he bought a farm near the village of Benbow in the northwest corner of Marion county and had moved to it from Quincy, Illinois. He was twice married. The defendant, Jacob Adam Young, usually known by the name of Adam, was and is his only child by his first marriage. No children were born of the second marriage. Adam was in his nineteenth year at the time of his father's death. Five or six years before the death of Ludwig Young, his second wife left him and remained separated from him. After she left, the deceased and Adam remained on, the farm together until October preceding the old man's death, when Adam also left. From the time Adam left, the old man lived on the farm entirely alone.

Early in the morning of Monday, December 5, about 8 o'clock, Mr. Killebrew, a neighbor on the adjoining farm, saw the deceased driving his wagon eastward through his farm. He was never seen alive after this by any witness in the case. On the following day (Tuesday, sixth of December) about noon, a young man, Forest Darr, called at Mr. Young's house for the purpose of paying some interest on a note held by Mr. Young against his father. After hallooing and getting no response and failing to find Mr. Young in the fields, he returned to Benbow, where he met a group of per-

sons.    One of the persons inquired whether he had
found Mr. Young and was answered in the negative.
It was thought proper that search be instituted to see
if Mr. Young could be found, and the person making
the inquiry, with another, went to Mr. Young's house
for that purpose.    Finding the outside of the house
locked they entered through a shed room, the door of
which was without lock.    Passing from the shed into
the room adjoining (the kitchen) they found a boot
with a sock in it sitting by a chair.    After passing from
the kitchen into and through all the rooms except the
southeast room, that being a general lumber room,
they opened a door leading into it, when they saw the
body of Mr. Young lying upon the floor.    They were
able at that time to distinguish but little in the room
as it was without light.    The room had only one small
window and the curtain at that was down.    In the
passage into or from the room in which the body was
found four doors intervened.    All the doors were found
closed.

These persons having made known their discovery,
about 2 o'clock of that day (Tuesday, Dec. 6) a num-
ber of persons collected at the house and the situation
was more accurately observed.    That situation was in
substance as follows: The body was lying on the floor
of the southeast room about midway between the
north and south walls;    the head towards the west
and the feet towards the east.    The room was eleven
by eleven and one half feet in size.    The body was
lying upon the back.    The head was lying back of a
large basket which was pretty well filled with onions,
potatoes and sundry pieces of carpet, sacks and rags
over them, the right leg was bent or drawn up at the
knee;    the left leg was extended upon the floor;    the
right arm was across or on the body and the left arm
was extended or partially extended by the body on the

floor.   On the left of the body lay a double-barreled shot gun—lengthwise with the body—the muzzle towards the head.   Defendant's witness, Turpening, states that the gun was between the left arm and the body, and the muzzle near the armpit.   No other witness spoke definitely as to its position.   This gun was old man Young's gun.   It was a large-bored, heavy and long gun.   The length of its barrel was estimated to be thirty-six inches.   Both barrels of the gun were empty.   One barrel (the right) had been recently discharged—there was part of a freshly burnt cap on the tube, and the insertion of a finger in the muzzle showed recently burned powder.   The other barrel was rusty in the muzzle and had not been recently loaded or fired.   A piece of a burnt gun cap was found on the floor about where the hammers of the gun had been lying.  On the right, or to the south of the body near the hips was found a chair—straight-backed and without arms—on which was some harness, partially covering the seat of the chair.

Further down towards the feet and on the same side of the body was another chair on which were some tools, possibly a brace and bits.   On the same side of the body sat a jug of common earthenware—its exact position is uncertain.   The jug had some whiskey in it and was closed with a piece of corn cob as a stopper. On the bulge of the jug, towards the body, was a splotch of blood, from which blood had run down vertically in separate lines and had also run partly around on the jug horizontally.   The surface of the jug was slightly corrugated and the corrugations were horizontal.   There was no blood on the stopper and none on the mouth or neck of the jug.

The door opening into the room from that on the west was near the north wall, a few inches or perhaps a foot from it, and opened inward against said

wall.   In addition to the contents already noted, the room contained three or four barrels of flour sitting along the south wall not far from the corner on the east, one of which was open; also some sacks of grass seed, and about opposite of the feet of the body a large German chest or trunk sat against the east wall.   The room was well filled.   The left foot of the deceased was bare.   The boot and sock of that foot were sitting by a chair in the kitchen.

In the left side of the neck and throat, or near the left temple (the witnesses differ as to its location) was the wound of entrance—a large rounded wound, the diameter of which was variously estimated to be an inch, an inch and a half, or two inches.   This was the only wound observed until the washing of the body on the next day (Wednesday) when a wound was discovered on the right side of the neck or throat.   This wound was more elongated, was much smaller, and lower down than the other.   The left side of the face was blackened with smoke, but there were no unburned grains of powder in the skin.   The jugular vein and carotid artery on the right side were severed by the shot, and a large quantity of the blood ran into and through the basket, saturating the carpet immediately about the basket.   The most of the blood ran into the basket.   There was not a great deal of the blood on the body, and that was mostly on the right side.   There was more blood on the right side of coat and vest than anywhere else on the body.   The right leg was spattered with drops of blood—the amount was less from the knee down to the foot.   It also was in nature of drops.   These drops appeared on instep of right boot. There was not so much blood on the left side, only some specks, smaller specks and not so thick.   These specks extended down to the knee; whether there was any blood on the left leg below the knee, or any on the

left hand it is not certain. On these points the state's witnesses differ. No blood was observed on the gun, and there was none on the bare left foot.

Outside of the space near the basket there was no observation as to whether there was blood on the carpet, nor the extent thereof. The predominant color of the carpet was dark red. On the south wall (which was covered with coarse soft plaster) about two feet from the east corner was a large patch of blood in which were found pieces of flesh, hair and particles of bone. Around and about the space covered by the blood were marks as of shot. Some shot were picked out of the wall and some other shot were found on the head of one of the barrels, and some on the floor; all were duck shot, and were battered. The space occupied by the marks was a foot or perhaps a foot and a half in extent. Sprinkles of blood were observed and a piece of flesh or bone was found in the open barrel of flour; a white rag on one of the chairs showed a drop of blood.

Three pieces of paper wadding were found and opened out, one was on his whiskers just below the wound on the left side, one was sticking to the blood on the wall, the other was lodged in a spider's web against the wall. All the pieces of paper were parts of a newspaper printed in the German language and in German characters. Four witnesses of the state testify as to the height of the patch of blood and shot marks from the floor, and the estimates given run from four to five feet and seven or eight inches. No measurement was made of anything and the testimony as to distance, length or size represents the guesses of the different witnesses in that regard.

It was further found that Mr. Young's team of horses was standing in the stable and that the horses had the harness on, the breast straps fastened to hames

on either side, and bridles hanging on hames.  There was no food in the manger.  His wagon loaded with corn stood inside the yard.  The chest or trunk appeared to have been opened at some time by forcing the lock—the clinchers of the wrought nails with which lock was fastened onto the chest having been broken off.  It contained old papers, letters, memorandum books, dishes and an old pocket book or two.  In the first pile of dishes taken out was found $60.  A small sum of money, sixty-five or seventy cents, was found in pocket book in his pocket.  At some time while the inquest was being held the fact was casually noticed by one of the witnesses, Mr. Darr, that the lower sash of an outside window of the east front room was raised. No examination of the window was made, and it was not noticed whether the window was covered by a screen or not.

The ground then was, and for several days had been, very soft and muddy.  No search for, examination or pursuit of, tracks was had or made by anyone. There was no trace of blood on the naked door of either of the three rooms, and no mark or trace of blood on either of the four closed doors through which the guilty agent is supposed to have passed from the room in which the body lay.  No blood was found upon the boot which was sitting in the kitchen room. State's witness, Brown, expressed the opinion that there was less mud on that than on the other boot.  The other witnesses, without exception, say that there was no difference in the boots in this regard.

At about half past 2 o'clock Tuesday afternoon (Dec. 6) *rigor mortis* had set up—whether only in progress or fully developed is not known.  At 3 or 4 o'clock the next afternoon, when the body was dressed for the coffin, the phenomenon of *rigor mortis* was in full expression.  How long it continued is not known.

Nothing unusual was observed in the conduct of defendant when he reached the house in company with his uncle from Quincy, nor during the inquest. Shortly after his arrival he was seen in the kitchen in tears. In response to inquiries, he said he last saw his father alive on the preceding Sunday; that he was in his house about 6 o'clock Sunday night—left about 8 o'clock the same night and spent the night in a straw stack by Parker's spring. The distance from Young's house to Benbow is about three-fourths of a mile or a mile; from Benbow to Quincy is about twenty or twenty-two miles; from Benbow to Parker's spring, four miles; from Parker's spring to Tucker's mill, one mile; from Tucker's mill to Hester, four miles; from Hester to West Quincy, twelve miles; from West Quincy to Quincy, one mile.

Four witnesses on behalf of the state testified concerning the condition at the house on the afternoon Tuesday. Their testimony as to the location of the wound of entrance was as follows: Witness Bohon said that the charge of shot entered on the left side, about just under the ear. Mr. Killebrew located the wound as being on the left jaw, and a little in front of the bottom of the ear. Mr. Brown said that the charge went in just below the ear and came out about the same place on the opposite side. Mr. Terrill located the wound as being in the left side of his head, just below and a little in front of the ear. Mr. Chipman, while not locating the wound on the left side, located that on the right side, as being under the jaw or ear, and said that it was oblong in shape, smaller than that on the left side and lower down. Mr. Massy said that the two seemed to be straight through. The observation of the wound by these witnesses was only casual—no one of them touched or examined it closely.

The testimony presented by the state to show the

connection of the defendant with the death as criminal agent is, in substance, as follows: The state offered in evidence the examination of defendant, had before the coroner at the inquest. It was admitted by the state that a summons was duly issued by the coroner commanding defendant to appear before him and be examined concerning the death of deceased; that said summons was duly served on defendant by the constable to whom same had been delivered by said coroner for service; that defendant, in obedience to the command of said writ, appeared before said coroner and jury and was then and there, in due form of law, sworn by said coroner, and was then and there by the coroner questioned and examined under his said oath; that the answers of defendant on said examination of him were by said coroner reduced to writing and same was by defendant signed. The writ of summons and return of service thereof were read to the court.

To the introduction of said examination in evidence defendant objected on the ground that the same was illegal and incompetent as evidence herein; that said examination was not a voluntary statement of defendant, but was the evidence of defendant under the compulsion of the process of the state and under the constraint of his oath. The objection was, by the court, overruled, and the said examination was read in evidence to the jury. The examination was directed entirely to matters tending to criminate, or prejudicial to, defendant. The inquiries embraced the fact of his having been at one time sent to the reform school by sentence of court; also, the fact that, when leaving his father's house about two months prior to time of inquest, he had taken $100 from his father's chest; also, the history of his movements and his whereabouts from that time; also the habit of his father as to keeping a loaded gun in the house; also, the fact of his

presence at his father's house on Sunday night previous and his whereabouts that night and next day (Monday, December 5); also, whether he had met Robert Johnson on his way to Quincy on Monday afternoon and the time thereof and what he had said to Johnson; also the threat imputed to him by Mary Johnson in her testimony previously given at inquest.

The remaining evidence on the part of the state consists of the testimony of James Vanhorn and S. T. Vanhorn, barbers at Quincy, J. B. Newman, Robert Johnson, J. B. Chilton, John Johnson and Mary Johnson. Its substance is as follows:

James Vanhorn: At Quincy on Tuesday, December 6, about 9 o'clock in the forenoon heard defendant in conversation complain of being tired and sore—he said he had walked from home. On Friday following, the brother of witness introduced witness to defendant's uncle and told witness that Adam's father was dead and had committed suicide. Afterwards he saw Adam and asked him if he thought his father had committed suicide and he said he had. He then asked Adam if anything was missing from the house and Adam said that he didn't know, that the trunk was broken open. Witness said, "It looks like someone had murdered him," and Adam said, "Oh, no! I think he committed suicide." This was after the inquest and funeral.

S. T. Vanhorn: About last of November defendant and he contracted for sale to defendant of interest in barber shop of witness for $45—witness to teach defendant the business. Defendant said that Mr. Smith owed him for work and would bring and sell some hogs and pay him and he would pay witness. From that time to Saturday before his father's death defendant had borrowed of witness in small sums the sum of $7.35. Defendant left Sunday, December 4, at noon—said he was going over after his money from

Smith, would return on Monday. "Saw him again on Tuesday morning in Quincy. He paid me $10 and said that he had paid him $24, and would pay the balance in two weeks." Defendant said that he had paid his board—supposed by witness to amount to $8 or $9—he had a new pair of shoes. Defendant had a gold filled watch when he went to work with witness that cost, as he said, $35. Witness last saw the watch about the middle of November. Afterwards, about nineteenth of November, defendant told witness that he had pawned the watch.

J. B. Newman: On Monday, December 5, he was hauling a load of hogs from Benbow to Quincy. The road was very muddy. During the afternoon at a point about two or two and a half miles east of Benbow saw a person traveling on foot going same way as witness. The person had a valise, also an overcoat tied up. The place was half mile west of Mrs. Marsbury's place and was west of Parker's spring. The person traveled along by side of his wagon about a mile and a half when witness stopped to rest his horses and the person went on. Near the bridge witness inquired the time of day of a person unloading corn by the road and was informed, as witness remembered, that the time was between half past 2 and 3 o'clock. He judged it to have been something like two or half past two when he first met the person. Some ten or twelve days afterward he met same person in Quincy and identified defendant as the person. While they traveled along together they had ordinary conversation of strangers, each asking the other as to where he was going and was informed—neither asked as to where the other had come from, or his business or name.

Robert Johnson: On Monday afternoon about 3 o'clock as witness was going towards Benbow on the Quincy road on horseback he met defendant in the road

going towards Quincy on foot. The place of meeting was about a mile east of the bridge and about a mile and a half or a mile and three-quarters east of Parker's spring. This road is the most public road in the county. When first seen defendant was fifty yards from witness in the road and his hat down on one side of his head. They met and passed when witness spoke to defendant. Defendant then stopped and conversation was had. Witness asked defendant whether he had been at home. Defendant told witness that he had been at home; that he had gone home the day before to get his clothes. From curiosity witness asked what his daddy had said, and defendant replied that "his daddy said that he couldn't have his clothes, but he got them just the same." Before the coroner the witness said he met defendant about 4 P. M., December 5.

J. B. Chilton: His son has a store and is postmaster at Hester. On afternoon of December 5, about a quarter to 5 o'clock, defendant stopped at the store and inquired the hour of day and whether he could get to Taylor's Station in time for Quincy train. Told defendant that he could not, as train time at Taylor was 5 o'clock and it then lacked only fifteen minutes of that time. There were at Hester two stores, two blacksmith shops and four or five dwellings within distance of a mile of the road. The road is one of the most public roads in the county.

John Johnson: He lived two miles east of Hester. On or about December 5, he was driving a slide home from Hester. About a half a mile west of his house defendant caught up with him and rode with him as far as witness went. Witness asked defendant how far up the road he had been, and defendant said he had come from Benbow and asked whether he could make the 6 o'clock freight train at Taylor.

Mary Johnson:   Witness was employed at service in the family of a neighbor, Mr. Wiley.  Her father lived about three-fourths of a mile from Mr. Young. About a month before defendant left his father's in the fall he walked home with witness from church—their meeting was casual.  On the way home defendant said: "If my father knew this he would raise thunder."  She said, "Why; don't he allow you to go in company or to church?"   He said, "No, he don't; but," he says, "I don't pay any attention to that; if I get the drop on him I will kill him."   This was the last time she saw him and she had never been with him but once before. Ever since Mr. Young's wife had left him defendant and his father had lived alone on the farm, and they continued so to do until defendant left about a month after.   She had never heard the expression "get the drop on him" before and didn't know what it meant. She asked defendant what it meant, and he told her; but she paid no attention to the explanation and had forgotten what it was.

The substance of defendant's evidence, outside of the matters embraced in the general statement, was as follows:

Dr. Pence's testimony:   He saw the body on Tuesday afternoon and made partial examination.  On Wednesday he was called by coroner's jury and made further examination as witness at inquest.   The state failing to call him as a witness defendant called him. The wound of entrance was just below the left temple in front of that bone (pointing) and orifice of the ear. The zygomatic process was about the center of the wound or a little below the middle of the wound.  The articulation of the temple and cheek bones was broken. He probed the wound, first used a probe and, that not being long enough, he then used a pair of dressing forceps, which are longer.   He inserted the forceps in

the left wound, and, following the track of the wound upward, found that the shot had passed through the brain and lodged against the skull at the top of the right side of the head. The forceps brought out shot and brain substance together. Four shot were thus brought out of the brain. They were No. 4 shot and were flattened. The skull at the top of the head was not penetrated.

The wound on the right side was on the side of the neck—in the angle of the jaw—lower down and smaller than the one on the other side. The jugular vein and carotid artery on the right side had been severed and the bleeding was from them on that side. The left side of the head and face were blackened with smoke. Immediately about the wound the hair and whiskers were scorched. He said that it was absolutely certain that the flesh in the mouth of the wound was burned. He expressed the opinion that the gun was almost if not immediately against the head. The separation of the charge was attributable to deflection occasioned by contact with the bone. When he first saw the body on Tuesday afternoon *rigor mortis* had set up—whether full or partial he did not observe. On Wednesday afternoon about two o'clock the body was completely rigid. From the position and condition of the body, the nature and character of the wound and the surroundings observed, witness was of the opinion that deceased committed suicide; this opinion he expressed also at the inquest. The testimony of Dr. Pence as to finding shot in the brain is corroborated by state's witness, Chipman.

Dr. Morris testified he resided in St. Louis and was superintendent of St. Louis Baptist Hospital. From 1884 to 1891, witness practiced his profession at Emerson, Marion county, and was the family physician of Ludwig Young. Some four or five years before

his death, Mr. Young had a severe illness, an abscess on the lung. It was supposed by the doctor and himself at the time to be quick consumption. For several days he expectorated immense quantities of pus, decayed or broken down tissue. Immediate danger passed away in ten days or two weeks, but he never recovered. "From that time until I last saw him in July, 1892, he was diseased. His disease was chronic bronchitis and was incurable. The expectoration of pus continued; was very offensive, as was also his breath. The decline of his vital force was constant and unmistakable—constant and evident but not great loss of flesh. His face was pallid. He was under my treatment from the time of the first illness until I removed to St. Louis." During all this time his physical condition was low and constantly and perceptibly failing. He often expressed the fact that he had no expectation of ever getting well. He had no social relations. Witness never knew of him making a social visit or going to church or any public meeting. After his wife left him he lived alone with his son Adam; he frequently talked with witness about his domestic troubles. He was exacting and easily excited to anger. Under ill health and family troubles he became despondent and gloomy. Witness never heard him express an intent to commit suicide, but he was depressed in spirits.

"*Q.* What would you say as to his view or philosophy of life?

"*A.* I never heard or saw any expression from him that led me to believe that he considered the life of a man to be different or higher than the life of an animal.

"Cadaveric rigidity ordinarily makes its appearance in from five to seven hours after death and ordinarily will continue from sixteen to thirty hours. Its

appearance would be earlier and it would pass off earlier in a body exhausted by disease or exercise than where contrary condition existed. In Mr. Young's case, as I know him, it would certainly not be delayed beyond the average. It would likely fall below the average.''

The testimony of state's witness, Terrill, on cross-examination, and of the several other witnesses of defendant testifying concerning the circumstances and condition of Mr. Young may be stated in summary as follows:

He was naturally of a gloomy and unsocial disposition—was exacting and irritable. His main, if not sole, concern was to make and save money. Several years before his death, trouble grew up between himself and wife, the result of which was that she finally separated from and left him. After she had left him he and his only child, defendant, Adam, then a boy thirteen or fourteen years old, remained alone on the farm. His health failed and he became afflicted with an incurable disease, known to him as consumption. He was unable to perform the necessary labor of the farm. He became dispirited and melancholy, was in constant suffering. He had no social relations whatever; visited no neighbors; was never known to go to church, although there were two churches close to his place; took no part or interest in public affairs.

At length his son reached the age of nineteen years and he also left him, taking $100 from his father's chest. His father was his curator under an Illinois appointment, and as such, had in his care certainly $120 belonging to Adam and some stock. Then he was entirely alone, and without any assistance. Thereafter his face expressed more of trouble, a deeper melancholy. Near neighbors say they never heard him laugh or saw him smile; he brooded over his troubles. While but

little disposed to talk, he expressed to three of his neighbors in gloomy words his weariness of life, declared that he had no one and nothing to live for, expressed the wish that he was dead; one witness thinks that he expressed the wish that he could kill himself. On these occasions he declined the neighborly consolations tendered. The last occassion of such expression was not more than a week before his dead body was found. In the midst of his depression and weariness of life, from the testimony of Mr. Turpening, it would appear he cherished the hope that his son would return and remain with him.

Defendant's witness, Turpening, having testified to seeing defendant, and to having a conversation with him in Quincy on the day following November election, 1892, was asked by defendant's counsel to state that conversation. The state objected. Defendant then offered to prove by the witness that at the time and place referred to, defendant informed witness of the fact that he (defendant) intended to go over to his father's in a short time; and further that defendant then and there told witness that he intended so to go in order to get his overcoat and other clothes. The state objected to the evidence offered and the court sustained the objection.

Defendant offered in evidence the record of the proceeding and judgment of divorce and alimony in favor of the wife of deceased, Ludwig Young, to which the state objected and it was excluded.

Defendant also offered as witnesses, Drs. Jandor, Norris, Coons and Ealy, two of whom had been surgeons throughout the late war between the states. They all, with Dr. Morris, concurred in expressing the view that the presence of *rigor mortis* in the body in marked expression as late as 3 or 4 o'clock on afternoon of Wednesday, December 7, would make it very highly

improbable that he should have died as early as about noon Monday; such a case would be phenomenal. The consensus of opinion of the five physicians was to the effect that death had not occurred as early as about noon that day. It pointed to Tuesday morning, certainly not earlier than the night of Monday as the time of death. The physicians each affirmed the observed and well known fact that the wound of exit is always larger than the wound of entrance where the entire projectile passes through..

The state read in rebuttal the examination of Dr. Pence taken at the coroner's inquest. There was no other in rebuttal. The jury returned the verdict of murder in the first degree.

In due time the defendant filed his motion for new trial. This motion the court overruled. In considering and overruling the motion the court did not consider or decide the question as to whether the verdict was against the evidence, or the weight of the evidence, being of the view that said questions were exclusively for the determination of the jury, whose determination thereof was not reviewable by the court. An examination of the record proper discloses no error against the defendant.

I.   The first exception saved, was to the ruling of the circuit court in excluding from the panel the three jurors, Muter, Kelly and Howell, because upon their *voir dire* they answered they would not convict upon circumstantial evidence, however strong. The trial court properly conformed to the practice previously approved by this court in *State v. West*, 69 Mo. 401, and *State v. Leabo*, 89 Mo. 247, and committed no error in rejecting said jurors.

II.   As already appears from the statement of facts, the circuit court permitted the state, over the objections of defendant, to read in evidence against

The State v. Young.

him, the examination of defendant before the coroner and jury of inquest. Defendant was brought before the coroner's jury by the force and command of a subpœna, duly and regularly issued, and served. Having appeared in obedience to the writ, he was duly sworn by the coroner. Thus sworn, he was questioned by the coroner and jurors and his answers to these interrogatories were reduced to writing and he was required by the coroner to sign the same. *This examination or statement consisted entirely of answers of defendant to the questions so propounded to him.*

Miss Johnson had previously testified before the coroner and in her evidence had sworn to a threat of defendant against his father. The examination on its face shows that its purpose was to elicit evidence of other offenses by defendant, and was clearly prompted by suspicion and to obtain from him criminating admissions. Defendant was an ignorant German boy. He was not advised that his answers might be used against him. He was without counsel and was not advised of his right to decline to testify. While not under formal arrest and charged with the murder of his father, the examination was conducted as if he were the defendant in a preliminary examination save that he was not accorded the privilege of testifying of his own volition or refusing, as he might see fit.

The question thus submitted to us is of the highest importance. By the constitution and bill of rights of this state, it is provided "that no person shall be compelled to testify against himself in a criminal cause." Constitution of Missouri, 1875, art. 2, sec. 23. It would not be tolerated for one moment, if the prosecuting attorney in this cause had in the circuit court offered to call defendant to the stand to testify after this charge had been preferred against him, but it is sought by reading this examination to obtain the same

end by indirection.

There are few questions upon which there is more conflict of decision by common law courts in England, than in this, respecting the admission of a statement under oath by a person while under examination as a witness before a coroner's inquest, in a subsequent trial of the same person for the same offense as to which he was so examined.

In *People v. McMahon*, 15 N. Y. 384, the court of appeals, through SELDEN, Judge, reviewed the learning on the subject and restated with great clearness the ground upon which the common law proceeds in such cases. He says: "The first distinction which it makes is between a declaration or statement made before, and one made after the accused was conscious of being charged with or *suspected of the crime.* If before, it is admissible in all cases, whether made under oath, or without oath, upon a judicial proceeding, or otherwise; but if made afterwards, the law becomes at once cautious and hesitating; the inquiry then is, was *it voluntary? For, unless entirely voluntary, it is held not to be admissible.*"

Another distinction made by the common law courts and followed by the courts of this country, is that a statement made under oath will not be rejected on account of its having been under oath, unless that oath was administered in the course of some judicial inquiry in regard to the crime itself, for which the person is on trial. *Wheater's case*, 2 Moody's C. C. 45; *Rex v. Merceron*, 2 Starkie, 366; *Josephine v. State*, 39 Miss. 613–650.

In *Regina v. Owen*, 9 Carr. & Payne, 238, on a trial for murder, the deposition on oath of the prisoner, taken before the coroner on the inquest held on the body of the deceased was rejected by Baron GURNEY.

In *Regina v. Wheeley*, 8 Carr. & Payne, 250, a state-

ment by the prisoner under oath before the coroner was rejected by Baron ALDERSON.

In *State v. Young*, Winston's Law (N. C.), 126, the defendants, were arrested as witnesses and brought before the coroner's inquest, and sworn and subjected to a rigid examination. They were afterwards charged with the crime and on trial in the superior court the state read their examination to the jury over their objections. For this ruling the cause was reversed, Judge BATTLE for the court, after referring to *Rex v. Lewis*, 6 Carr. & Payne (25 Eng. C. L. Rep. 333), 161, saying: "The circumstances of the case now before us are still stronger to show that the prisoners were under restraint in giving their testimony. They *were suspected of having committed the homicide*, were under arrest, and were subjected, * * * to a rigid examination. *Although treated as witnesses*, they were, in truth, prisoners, under examination, and as such, nothing, which they stated, under oath, ought to have been admitted in evidence against them; see Roscoe's Crim. Ev. 61."

The great question after all is, was the statement voluntary; and it must be determined from the facts in each case. The circumstances of this case, rebut every presumption of voluntary statement. Every word of this statement was elicited by an adverse question. It was given under the compulsion of the subpœna and the oath. *State v. Senn*, 32 S. C. 392. The defendant was not suffered to make one statement of his own suggestion and accord. If he had any perception at all, *he could not fail to observe that he was suspected of his father's murder and was subjected to this examination for the purpose of disclosing his guilt.*

This question came before this court in *State v. Mullins*, 101 Mo. 514. In that case the defendant voluntarily gave himself up to the nearest justice, admit-

ted the killing and voluntarily attended the inquest, and gave his own evidence to show he acted in self-defense. Although it was a coroner's inquest only, this court then treated defendant as if it had been his preliminary examination, and said, "treating the defendant then as one occupying the position of a defendant at the preliminary examination, the evidence was competent, *provided he testified of his own volition and not by compulsion.*" The presumption was indulged that until the contrary appeared the statement was voluntary. Here we think the contrary most conclusively appears in this case and that the presumption is rebutted.

The constitution means more than the protection of the accused on his final trial when his rights are scrupulously guarded by the courts. It as clearly protects him from being forced to testify against himself in any and all preliminary investigations, whether before the coroner, grand jury or the justice on his preliminary examination. The immunity afforded him by the constitution is broad enough to protect him against self crimination "before any tribunal, in any proceeding." *Counselman v. Hitchcock*, 142 U. S. 547; *Cullen v. Commonwealth*, 24 Gratt. 624; *State ex rel. v. Hardware Co.*, 109 Mo. 118.

In *Counselman v. Hitchcock, supra*, the question was propounded to a witness before a grand jury and he declined to answer, and the supreme court of the United States held it to be a reasonable construction of the constitution, that the witness was protected "from being compelled to disclose the circumstances of his offense or the sources from which, or the means by which, evidence of its commission, or of his connection with it, may be obtained, or made effectual for his conviction, without using his answers as direct admissions against him," citing *Emery's case*, 107 Mass. 172, and

the witness was discharged on *habeas corpus*.

In *State v. Clifford*, 53 N. W. Rep. 299 (supreme court of Iowa), a defendant was taken before a grand jury just as in this case defendant was taken before the coroner, not of his own volition, but by direction of the grand jury, and was sworn and examined. That examination was afterwards offered and admitted against him and the cause was very properly reversed for that reason.

In *People v. Mondon*, 103 N. Y. 211, after the finding of the body of the deceased, the defendant was arrested without warrant as the suspected murderer. While he was thus in custody, the coroner impaneled a jury and held an inquest and the defendant was called as a witness before the inquest and was examined by the district attorney and coroner. "The prisoner was an ignorant Italian laborer, unfamiliar with the English language. He was unattended by counsel, and, it does not appear that he was in any manner informed of his rights, or that he was not bound to answer questions tending to criminate him." The examination thus obtained was held inadmissible and the cause reversed.

In *Wood v. State*, 3 S. W. Rep. 336, the court of appeals of Texas, also had this question before it. Judge HURT thus tersely states the doctrine in that state: "This question will be treated independently of our statute upon the subject. A most admirable opinion upon this subject will be found in the case of *People v. McMahon*, 15 New York, 384. In that case the authorities are collated and from them the following rule is deduced: 'When a party is examined as a witness before a magistrate or coroner's inquest and is afterwards prosecuted for the same offense under investigation, his testimony, so taken, will not be received against him if, at the time of his examination, he was

charged or suspected of the crime, and that he was informed of the charge or suspicion against him.' This we believe to be the correct rule; that which is supported by the weight of authority. It will be seen that the fact of arrest or no arrest does not figure in this proposition. Whether the party be under arrest, either by warrant or without warrant, or is not under arrest, if he is charged or suspected of the crime * * * his testimony taken before the magistrate or coroner's inquest is not admissible against him."

Our conclusion is that the examination of defendant was in no sense voluntary, and was inadmissible against him.

So much of it as referred to the offense for which he was sent to the reform school and to the taking of the one hundred dollars from his father's trunk in October previous to his death referred to distinct crimes wholly disconnected with the murder of his father, and was well calculated to confuse and mislead the jury and was for that reason also incompetent. *State v. Parker*, 96 Mo. 382; *State v. Jackson*, 95 Mo. 623.

III. During the examination of Mr. John W. Turpening, he mentioned the fact that, on the night after the presidential election of 1892, he saw the defendant in Quincy and had a conversation with him. "Defendant then offered to prove by this witness that at that time and in that conversation defendant informed witness of the fact that he, defendant, intended to go over to his father's in Missouri in a short time, in order to get his overcoat and other clothes." The court refused the evidence and defendant saved his exception, and assigns this ruling of the circuit court as error.

When it appeared that defendant was at his father's house so near to the time of the homicide, it is at once apparent that it became important for him to

·rebut the suggestion of secrecy or concealment in his visit and to show the lawful purpose of his visit.   It is a general principle that a party charged with crime can not by his own acts and declarations make evidence in his own favor; but the intent with which any act is done is that which distinguishes it as a crime from a lawful act.   So when the state had shown defendant's presence at his father's house, it was competent to show, first, by his declaration, that there was no secret about it, and secondly, the lawful purpose, namely, to obtain his winter clothing for the season just coming on.   If this was his. purpose, certainly it would be evidence tending to counteract the suspicion that might arise from the suggestion of a secret visit and no lawful purpose disclosed.   We think the court erred in excluding the evidence.   *State v. Graham*, 46 Mo. 490; *State v. Gabriel*, 88 Mo. 631.

Moreover it was competent as a part of the *res gestæ*.   He did go from Quincy to his father's and did get his clothing.   When such statements are the natural and inartificial concomitants of an act and explain it, they become a part of the *res gestæ* and are not to be excluded merely because made by the accused. Chamberlayne's Best on Ev. [International Ed. 1893, 1894], p. 446.   It is for the jury to weigh them and determine whether they were made as the part of a criminal scheme or were the natural, undesigned expressions of an innocent man, illustrative of his acts.   *Hunter v. State*, 40 N. J. L. 495; *Com. v. Abbott*, 130 Mass. 472; *Com. v. Trefethen*, 31 N. E. Rep. (Mass.) 961; *Ins. Co. v. Hillmon*, 145 U. S. 285; *Price v. State*, 72 Ga. 441; *Johnson v. State*, 15 S. W. Rep. 647.

So likewise and on the same grounds, was the evidence of Edward Burblinger competent, not as evidence of the facts or intentions declared, but merely as proof of the fact, that he told the witness that he had been

to his father's house.  This fact was competent as tending to rebut the charge or theory of concealment.

IV.  The circuit court gave instructions of its own motion for murder in the first degree or acquittal.  To the action of the court in giving this instruction, defendant duly excepted at the time.  Counsel for defendant, in his motion for new trial, complained of the action of the court in thus limiting the jury to a finding of murder in the first degree or an acquittal and called the court's attention to the fact that the prosecuting attorney in his argument had submitted to the jury as an hypothesis supported by the evidence that defendant had gone to his father's house for his clothes; that his father had objected and a quarrel had ensued between the father and son, and in the quarrel and difficulty defendant had shot and killed his father, and in so doing, had argued against the court's said instruction.

A careful review of this evidence discloses no evidence of a struggle.  Indeed including the fact that Ludwig Young came to his death by a shot from his own gun in his own house, the evidence is wholly circumstantial.  While the presence of defendant at his home near the time is evidence with the other evidence of a threat by him against his father, tending in some degree to show him the guilty agent in his father's death, the details and circumstances attending the killing are all wanting.  Whether it was deliberate assassination without warning or provocation, or whether it was the result of angry crimination and recrimination, we think is a matter wholly of conjecture under this evidence, even if it be conceded that Adam Young fired the shot, and that there is sufficient evidence to justify such a finding.

Conceding then, that the jury were justified by the evidence in finding that Ludwig Young did not commit

suicide, and that Adam Young intentionally shot and killed him, proof of willful and intentional killing alone will not raise the presumption of murder in the first degree. The argument of the prosecuting attorney would seem to imply that it was sufficient to convict him of murder in the first degree if the jury found that defendant intentionally shot and killed his father, but such is not and never has been the law of this state. In *Foster's case*, 61 Mo. 549, Judge WAGNER for this court declared: "No case has ever declared, that where the killing was merely willful or intentional * * * that deliberation and premeditation, the main ingredients of the offense, followed as a presumption of law. In *Underwood's case*, 57 Mo. 40, there was an instruction that if the killing was by shooting, the law presumed that it was intentional, and it would be murder in the second degree."

V. Appellent contends that the tenth instruction given in behalf of the state is erroneous. This instruction is alike in all respects to the second instruction for the state in *State v. Carlisle*, 57 Mo. 102, which then met the approval of all the members of this court, and has often been approved since, and although there is rarely any necessity for it, it does not constitute error.

VI. The learned counsel for defendant, both orally and in his brief, presses upon us that the verdict in this case is against the evidence, and we are confronted with the proposition, that the examination of this evidence by this court is imperative for the reason that the learned judge of the circuit court declined to consider the weight or sufficiency of the evidence on the hearing of the motion for new trial because, in his opinion, questions of the sufficiency and weight of evidence were exclusively for the determination of the jury under the instructions of the court.

That the circuit judge was bound to determine

whether the verdict of the jury was contrary to the evidence, when requested to do so by a motion for new trial, we think is too plain for discussion. This is made one of the causes for new trial by the statute, section 4269, Revised Statutes, 1889, and the practice is as old as the common law itself. That this court has refused to interfere and grant new trials in opposition to the opinion of the trial courts on the ground that the verdict was against the evidence, when there was evidence from which the jury might infer the facts material to their verdict, is an entirely different proposition. That rule is founded upon the consideration that the circuit judge saw the witnesses, observed their character, capacity and demeanor and has affirmed the correctness of their verdict, but in this case we have no means of knowing how the learned judge of the circuit court regarded this evidence. The power conferred by law on trial courts to award new trials was not designed to be a mere formal authority, but was intended to guard against the mistakes, passions, prejudices and ignorance of jurors. The judge has a higher and more responsible duty than to merely record the verdicts of juries. In the true conception of the law, he is to exercise an effective controlling judgment over their verdict. If a judge is satisfied that a verdict is against the weight of the evidence, it is his duty to set it aside and award a new trial, otherwise the supposed power of the courts over verdicts is a mere mockery. The unsuccessful party is entitled to his new trial if at all in the trial court without the great delay and additional cost of an appeal to this court. The court clearly erred in not considering this ground for new trial in this case.

That this court may grant a new trial when the verdict can be ascribed to prejudice, passion or partiality, is no longer open to doubt. *State v. Primm,* 98

Mo. 368, and cases cited.

In view of the fact that this cause must be reversed because of the admission of defendant's statement before the coroner and because the court excluded competent evidence offered by defendant and for failing to instruct on murder in the second degree, we do not feel called upon to express an opinion upon the weight of this evidence. It is sufficient to say that we think the defendant is entitled to a new trial in accordance with the views herein expressed. The judgment is reversed and cause remanded for a new trial. BURGESS and SHERWOOD, JJ., concur.